THE NEW-YORK EQUITABLE INSUARANCE COMPA-
NY _vs._ LANGDON.

A _grocery_ may be kept in a building insured, if the business of a _grocer_ is not specified in the _policy of insurance,_ in the enumeration of prohibited occupations; and _spirituous liquors, oils,_ and other articles commonly dealt in by grocers, may be kept in the building as incidental to the business, although there be a clause in the policy suspending its operation, if such articles be stored in the building.

The keeping of such articles in quantities in the cellar of the building, purchased for the purpose of selling out by retail, and from which the stock in the store is from time to time replenished, is not a _storing_ within the meaning of the policy.

ERROR from the superior court of the city of New-York. The company insured Langdon against loss or damage by _fire,_ to the amount of $2000, upon a three story brick building, with slate roof, situate at the corner of two streets. The house was burnt down within the time for which it was insured, and Langdon brought a suit against the company to recover for the loss. The policy contained the usual clause _suspending_ its operation in case the building should, during the term for which it was insured, be appropriated, applied, or used, for the purpose of carrying on or exercising therein any trade, business, or vocation, denominated _hazardous_ or _extra hazardous,_ or specified in the _memorandum of special rates,_ in the proposals annexed to the policy ; or for the purpose of _storing_ therein any of the articles, goods, or merchandise, in the same proposals denominated hazardous or extra hazardous, or included in the memorandum of special rates, unless in the policy otherwise specially provided for or subsequently agreed to. The _description_ of trades, occupations, goods, wares, and merchandise, denominated _hazardous_ and _extra hazardous,_ and the _memorandum_ of special rates specified in the proposals in this case, is almost identically the same as in the _proposals_ of the _Sun Fire Insurance Company,_ which may be seen, _ante, p._ 490, and by which _spirituous liquors, oil,_ &c. are classed amongst merchandise denominated _hazardous._ The building insured belonged to the second

class of hazards, the annual premium upon which was 25 cts. per $100, and *hazardous* trades and goods were chargeable, by the proposals, with 12½ cts. per $100, in addition to the annual premium. The premium charged in this case was 25 cts. per $100. The plaintiff proved, by the surveyor of the company, the report made by him to the company, containing a description of the building insured, in which the first story was described as " to have (the building then being erecting) one room with fire-place, the *store*, entry, and stairs ;" and by other witnesses, that the manner in which the *store* part was built, and its situation, being a corner house, indicated that it was intended as a grocery store at the time the building was erected. The fire which destroyed the building originated at a distance from it, and reached it by running along the roofs of the intermediate buildings, until it came in contact with the upper part of the building in question.

On the part of the defendants it was proved, that at the time of the fire, a tenant of the plaintiffs occupied the *store* on the front floor, and the *cellar* under the same ; he kept a family *retail grocery* in the store, and had on hand in the store and cellar, at the time of the fire, various kinds of *spirituous liquors, oil*, and other articles usually kept in *retail grocery stores ;* he generally kept all kinds of spirituous liquors ; he used the cellar to put in such goods as were intended to be retailed in the store. When the fire happened, he had in the cellar one cask of oil, one barrel of rum, one cask of Jamaica spirits, one pipe of gin, some molasses, and some potatoes. He generally retailed his goods from the store, and kept a part of his stock there for that purpose, and replenished his stock in the store from that in the cellar, as occasion required. The oil in the cellar remained in the original cask, but all the casks of liquor had been more or less drawn from for the use of the store. The liquors he had in the store were drawn from those casks, and he had only a barrel or cask of each article, out of which that in the store was taken. All the *goods*, as well in the cellar as store, were purchased and kept for the purpose of selling out *by retail*, in small measure or parcels, in the store. The goods in the

*store* were all removed after the building took fire, but before the roof fell in; the goods in the cellar were all consumed by the fire. The defendants then offered to prove that it was, and always had been the uniform *custom* among the underwriters on fire policies used in the city of New-York, in all cases where retail grocery stores are intended to be insured, if in such stores it is the intention of the assured to keep spiritous liquors for sale by retail, to state that such privilege is granted, either by inserting the same in the body of the policy, or by an endorsement thereon, or by some other memorandum in writing; which evidence was rejected by the court. The court charged the jury that the keeping the *grocery store* in the building, and using the *store* and *cellar* for the purpose of carrying on therein the business of a *retail grocery store*, and for the purpose of keeping therein for sale, in such retail grocery store, the oil, spirituous liquors, rum, and gin, as had been testified to, was not a violation of the contract on the part of the plaintiff; and that the keeping the oil and spirituous liquors in the store and cellar for the purpose of sale, was not a *storing* within the intent and meaning of the policy; and that the evidence offered was not sufficient to bar the plaintiff of his action. The jury found for the plaintiff, with $2070 damages, on which judgment was rendered. The defendants sued out a writ of error.

*C. C. King*, for plaintffs in error. Every stipulation in a policy must be strictly complied with, or the insurer is not liable. 1 *Marshall on Ins.* 348. *Parke on Ins.* ch. 18. *Phil. on Ins.* 124 *to* 128. The same rule is applicable to *fire* as to *marine* policies. 6 *Cowen*, 673. The rate of premium received, shews that the underwriters did not assume a risk, arising from hazardous business, or from hazardous goods; for if so, they would have charged the additional premium. Allowing that a *grocery*, not being prohibited, might be kept in the building, it does not follow that articles expressly prohibited, such as *spirituous liquors* and *oil*, could be kept for sale. The contract was violated also by the *storing* in the building of prohibited articles. The term *storing* is used in the policy without any restriction, and the underwriters may

NEW-YORK,
May, 1831.

N. Y. Equita-
ble Ins. Co.
v.
Langdon.

insist upon a strict literal construction. It cannot be limited to warehousing, but must be considered as applying to any storing for the purpose of carrying on business.

*W. Slosson*, for defendant in error. The assurers had all necessary information when they entered into the contract; they knew the building was to be occupied as a store, and from its locality, might well suppose it would be used as a grocery ; they, therefore, must be held strictly within the rules of law. A variety of trades and occupations are enumerated in the proposals, the carrying on of which, in the building, suspends the operation of the policy ; that of a *grocer* is not mentioned, and the maxim *expressio unius exclusio est alterius* applies. 2 *Johns. C.* 289. Nothing but fraud will extend the contract. 1 *Johns. C.* 340. If a *grocery* is allowed, every incident to the carrying on of such business is permitted, and in support of this proposition, the counsel cited 15 *Johns. R.* 338 ; 8 *East*, 273. The keeping of the articles of merchandise by the tenant of the plaintiff in the quantities, manner, and for the purpose for which they were kept, was not a *storing* within the meaning of the policy. The word *storing* here, applies to an appropriation of the building to the keeping of goods for *custody*, to be delivered as received, where such is the exclusive, or at least chief object, and not where the main object is different, and the other merely incidental ; it does not apply to the keeping of goods for *consumption*. Storing is a technical word and has an obvious meaning ; no one speaks of furniture kept in a dwelling as being stored ; it is there for use. If this policy be avoided, the insurance of almost every respectable liver in city and country is void, who has in his house a cask of wine. If the grocer abuses his licence, the exception in the policy may apply. It is the purpose for which the articles are kept, which gives character to the keeping. Keeping a coffee-house is not keeping a tavern. 4 *Campb.* 76, 7.

*D. B. Ogden*, in reply. The survey speaks of a *store*, and the building was on a corner, but it does not necessarily follow that the assurers knew that a *grocery store* would be kept there. To say that the business of a *grocer* is not prohibited

NEW-YORK,
May, 1831.

N. Y. Equita-
ble Ins. Co.
v.
Langdon.

by the policy, is begging the question ; for, if to the successful prosecution of his business, it is necessary that the articles prohibited by the policy should be kept in the building, the business itself is prohibited.  The plain and obvious meaning of the contract is, that all occupations are prohibited, the carrying on of which necessarily brings into the building the hazardous articles specified in the contract.  The smallness of the quantity cannot affect the question of *storing;* if the articles were kept in the cellar, because not wanted in the store, then they were literally stored in the cellar.

*By the Court,* SUTHERLAND, J.   It was an express provision of the policy in this case, that if the *building* insured should, at any time during the continuance of the policy, be appropriated, applied or used, to or for the purpose of carrying on, or exercising therein, any trade, business or vocation, *denominated hazardous, or extra hazardous, or specified in the memorandum of special rates in the proposals annexed to the policy,* or for the purpose *of storing therein,* any of the articles, goods or merchandise, in the same proposals denominated hazardous or extra hazardous, or included in the memorandum of special rates, the policy should cease, and be of no force or effect.  The trade or business of a 'grocer is not mentioned or specified in the proposals annexed to the policy. It was not therefore a prohibited trade.  *Expressio unius, exclusio est alterius.*   The enumeration of certain trades, or kinds of business, as prohibited on the ground of being hazardous, is an admission that all other kinds are lawful under the contract.   The case of *Baker* v. *Ludlow,* 2 *Caines,* 288, is precisely in point.   There *dried fish* were enumerated in the memorandum clause as free from average, *and all other articles perishable in their own nature.*   It was held that the naming of one description of fish implied that other fish were not intended ; and that the subsequent words, " *all other articles perishable in their own nature,*" were not applicable to the articles previously enumerated, and did not repel the implication arising from the enumeration of them.   In *Doe ex dem. Pitt,* v. *Lanning,* 4 *Campb.* 76, 7, Lord Ellenborough held, that a *coffee house* was not an *inn,* within the meaning

of a policy of insurance against fire, enumerating the trade of an *inn-keeper*, with others, as double hazardous, and not covered by the policy.   If the business of a *grocer* is not prohibited under the policy, the ordinary incidents of that business, it would seem were allowable, not being prohibited, the party had a right to keep a grocery store, and to conduct it in the usual manner.   The case of *Luckley* v. *Furse*, 15 *Johns. R.* 342, and *Kensington* v. *Inglis*, 8 *East*, 273, sanction this principle.

The only question then is, whether the keeping of *oil* and *spirituous* liquors in the store, under the circumstances disclosed in the case, was appropriating or using the building for the purpose of *storing* those articles within the meaning of the policy.   Every thing that was kept, either in the store or cellar, was kept for the purpose of being retailed.   The smaller vessels in the store were replenished from the larger ones in the cellar, which consisted at the time of the fire of one cask of oil, one barrel of rum, one cask of Jamaica spirits, and one pipe of gin; from all of which more or less had been drawn for the use of the store.   It appears to me that the word *storing* was used by the parties in this case in the sense contended for by the plaintiff, viz. a keeping for safe custody, to be delivered out in the same condition, substantially, as when received; and applies only where the storing or safe keeping is the sole or principal object of the deposit, and not where it is merely incidental, and the keeping is only for the purpose of consumption.   If I send a cask of wine to a ware-house to be kept for me, that is a *storing* of it; but if I put it into my cellar or my garret to be drawn off and drank, I apprehend the term would not be considered as applying.   Suppose all the varieties of wine were denominated hazardous by the various insurance companies, and the *storing* of them was prohibited in their policies; could it possibly apply to the private stock which a gentleman might keep in his own house, for his own use and consumption?   It certainly would be perverting the term from its ordinary, and generally received acceptation.

I think the court below ruled correctly, and that their judgment ought to be affirmed.