SMITH v. GERMAN INSURANCE CO.

270:36 LRA51

1. JURORS — COMPETENCY — INTEREST AS TAXPAYERS — CONSTITU-
TIONAL LAW.
　　1 How. Stat. § 466, providing that, on the trial of an action
　　in which a county is interested, the electors and inhabitants
　　of such county shall be competent jurors, is not invalid as
　　attempting to deprive a party of his constitutional right to a
　　trial by an impartial jury, since the interest of such persons
　　as taxpayers is so remote that it may be presumed to be
　　incapable of influencing their conduct.

2. FIRE INSURANCE—VIOLATION OF CONDITIONS IN POLICY—EM-
PLOYMENT OF MECHANICS.
　　Painters are not "mechanics," within the meaning of that term
　　as used in a fire policy providing that it shall be void "if
　　mechanics be employed in building, altering, or repairing the
　　premises for more than 15 days" without the consent of the
　　insurer.

3. SAME—ESTOPPEL.
　　Where an insurance company, with knowledge of all of the cir-
　　cumstances attending a loss, undertakes to notify the insured
　　of its specific reasons for denying liability, it cannot, when
　　sued upon the policy, set up any additional grounds of defense.

4. SAME—STORING EXPLOSIVES—REPAIRS.
　　A provision in a fire policy that benzine, gasoline, naphtha, or
　　other explosives shall not be "kept, used, or allowed" upon
　　the premises insured is to be understood as prohibiting only
　　the habitual keeping, using, or allowing of these articles on
　　the premises, and not their occasional introduction for some
　　temporary purpose connected with the occupation of the prem-
　　ises, such as making ordinary or necessary repairs.　Thus, the
　　keeping of a five-gallon can of gasoline in the building for
　　several weeks, from which to supply torches used in removing
　　old paint from the outside of the building preparatory to
　　repainting it, does not constitute a violation of this provision
　　of the policy.　GRANT, J., dissenting.

5. SAME—INCREASE OF HAZARD—REMOVING PAINT BY USE OF GASO-
LINE TORCHES.
　　A condition in a fire policy avoiding it in case the hazard is in-
　　creased without the consent of the insurer should not be con-
　　strued to forbid the making of ordinary repairs in a reasonably

safe way, although involving a temporary increase of risk. Hence, it cannot be said, as a matter of law, that the use of gasoline torches in burning old paint from the metal-covered cornice of a brick building, in order to repaint it, increases the hazard, within the meaning of such a provision, where there is evidence that it is customary to remove paint in this manner, but the question is a proper one for the jury.  GRANT, J., dissenting.

Error to Eaton; Smith, J.  Submitted October 24, 1895.  Decided December 10, 1895.

*Assumpsit* by John B. Smith, treasurer of Eaton county, against the German Insurance Company of Freeport, Illinois, on a fire policy.  From a judgment for plaintiff, defendant brings error.  Affirmed.

*Howard & Roos (Thomas Bates*, of counsel), for appellant.

*Lyman H. McCall* and *George Huggett*, for appellee.

LONG, J.  On October 28, 1893, the defendant issued to the treasurer of Eaton county its policy of insurance, covering $3,000 on the Eaton county courthouse, for three years.  The policy was the Michigan standard form, and contained the following conditions:

"This entire policy, unless otherwise provided by agreement indorsed hereon or added hereto, shall be void * * * if the hazard be increased by any means within the control or knowledge of the insured, or if mechanics be employed in building, altering, or repairing the within described premises for more than 15 days at any one time, or if * * * there be kept, used, or allowed on the above-described premises, benzine, * * * gasoline, * * * naphtha, * * * or other explosives."

It appears that on October 12, 1893, some two weeks before this policy was issued, the board of supervisors provided by resolution for the appointment of a committee to repaint the courthouse.  This committee, on June 1, 1894, entered into a written contract with S. H.

Sleater to have such work performed. Sleater and his employés commenced this repainting three weeks and three days previous to the fire, and continued the work, with the exception of one or two days, up to that time. For the purpose of removing the old paint, preparatory to repainting, gasoline torches were used to blister or loosen it. The courthouse was a brick and stone structure, with metal roof and tower. The framework of the roof, tower, and cornice was wood, the tower and cornice being covered with galvanized iron, and the roof with tin. The iron work of the building, except the roof, had been previously painted and sanded to imitate stone, and this sanded paint, at the time the policy was issued, was peeling off; and it is claimed that, in order to make a good job of painting, it was necessary that it be scraped off the iron work.

Some contention is made on the part of the defendant that, during the time these torches were being used, the season was very dry; while, on the other hand, plaintiff's testimony showed that from the 16th to the 24th of June of that year there was considerable rain, and that on the 28th it rained nearly all day. It does appear that by the 4th of July most of the paint had been removed from the cornice by the use of these torches, and that Mr. Horn, who had done most of the work on the cornice, had worked some portion of that day thereon, when, about half-past 5 in the afternoon, the courthouse was discovered to be on fire. The fire seems to have originated some 15 feet distant from where Mr. Horn last used his torch on that day. After the fire, the part of the cornice where he last worked was found to be intact.

Defendant contends that the torch had come in contact with some straw and other substance carried into the cornice by the birds, and that the iron work of the cornice in various places had become loosened, so that, by the use of the torch, the fire, penetrating through such crevices, communicated with the wood work. But we

think this statement hardly borne out by the record; and Mr. Horn testifies that he found only two places where the galvanized iron was clear off; that one of the little panels had come off, but he had passed over that, and that there was one other bad place on the west end, but he had not reached that when the fire occurred; that all the balance of the cornice was in good condition, and he found no place where the seams had opened. There is little contention, however, but that the fire was in some way communicated by the use of this torch. It also appears in the case that the gasoline used in these torches was carried into the tower of the courthouse in a five-gallon can; and, in order to supply the torches, the men passed over the roof of the building into the tower, and filled them from the can; and, up to the time of the fire, Mr. Horn had used from one-half a gallon to a gallon per day, and the others something more than that. The torches were so constructed that, by pumping in air, a gas would be generated, which, if ignited, would create a very hot flame. As some of the witnesses express it, it was upon the same principle as the blow-pump used by jewelers in welding their jewelry.

Replying to the letter of plaintiff, inclosing proofs of loss, the defendant, under date of October 1, 1894, wrote as follows:

"We have to say that we have given the matter prompt attention, and thoroughly investigated as to the origin of this fire, and as to the condition of the property at the time of the fire, and find that there was employed at the time of the fire, and previous thereto, one or more men who were using gasoline torches for the purpose of burning off the paint on the cornices and other portions of the courthouse, and there was stored in the courthouse gasoline for this use and purpose in considerable quantities, and in such quantities as would be a large increase of the hazard; and, further, the use of gasoline in gasoline-burning torches for burning off paint is a very great increase of hazard, so much so that it is a violation of the

107 MICH.—18

conditions of the contract; and, with the information we now have as to the use of this gasoline and its storage in the building,—all within the knowledge and control of yourself, as treasurer, and of the county commissioners of your county, having charge of the county property,— this company must conclude that such act on the part of the proper officials of Eaton county was a voidance of the contract, and that by this serious increase of hazard the policy was voided before the fire. Hence we call your attention to these facts to explain to you the position which this company would be obliged to take in this case. If, as we understand from the reports we have received, these conditions existed, clearly the policy was void and of no effect, and there could be no liability under it after the use and storage of gasoline in and on the premises. And, further, that you may not be misled as to the position of this company, we again repeat, if these conditions as to the use and storage of gasoline existed, the policy was absolutely void, and there is no liability thereunder."

Upon the trial before a jury in Eaton county, the plaintiff had verdict and judgment for the amount of the policy, with interest.

The first objection to the proceedings relates to the trial of the cause in Eaton county. Before the trial came on, the defendant moved for a change of venue, based upon the affidavit of one of its counsel, which states—

"That in each of said causes [there were four suits pending upon separate insurance policies] there will be an issue of fact as well as issue of law to be determined, in the opinion and judgment of deponent, and the deponent has thoroughly examined into said cases, and believes he understands the issue involved in said causes. Deponent further says that, in his judgment, it will be impossible to get an impartial jury to try said causes, or either of them, in said county, from the fact that the jurymen, being taxpayers, would be directly and financially interested in having the plaintiff recover judgment."

This motion was overruled. At the commencement of the trial, before the jury were sworn, counsel for defend-

ant, in order to again raise the question, challenged each juror on the ground that he was a taxpayer of the county, and therefore incompetent to sit in the case. These challenges were overruled.

Section 7555, 2 How. Stat., provides that the list of jurymen shall be taken from the assessment roll, and each regular juror was presumably a taxpayer of that county; but section 466, 1 How. Stat., provides:

"On the trial of every action in which a county shall be interested, the electors and inhabitants of such county shall be competent witnesses and jurors."

The contention is that this act is unconstitutional, as it seeks to deprive a party of the right to a trial by an impartial jury. We think there is no force in this contention. It is competent for the legislature to provide that, where the interest of a person is merely that of a taxpayer of a municipal corporation, it shall constitute no disqualification of him as a juror, judge, or commissioner in a case where the corporation is a party. As was said in *City of Minneapolis* v. *Wilkin*, 30 Minn. 142:

"This does not infringe upon the constitutional right of a party to an impartial tribunal to hear his cause. Public policy and the necessities of the case require that this should be so. The ground upon which such ruling is usually placed is that such an interest is so remote, indirect, and slight that it may be fairly supposed to be incapable of affecting the judgment or influencing the conduct."

This same rule is laid down by Judge Cooley in his work on Constitutional Limitations (6th Ed., p. 508).

The principal contention arises over the charge of the court, which is as follows:

"No. 1. I instruct you that there is no foundation for the claim in this cause on the part of the defendant that the policy in question was rendered void by reason of mechanics having been employed in repairing the building for more than 15 days without any agreement indorsed upon the policy or added thereto permitting the

same. The evidence clearly shows that only painters were employed in repainting the building. Painters are not 'mechanics' in the sense of this term as used in this policy; and neither the painters employed nor the work they did is embraced in this provision. And I further instruct you that, were such employés and their work comprehended within the meaning of this provision, still the defendant has waived any breach thereof, if any ever occurred, and is now estopped from raising this question. You will, therefore, not consider this objection as constituting any defense whatever to this action.

"No. 2. You are further instructed that the third objection of defendant—that is, that gasoline or naphtha was stored in the courthouse in violation of the provisions of the policy prohibiting the keeping, using, or allowing on the premises of benzine, gasoline, naphtha, or other explosives—is also without force or foundation. This condition in the policy must be understood as prohibiting only the habitual keeping, using, or allowing of any of these articles on the premises, and not the occasional introduction thereof for some temporary purpose connected with their occupation, such as making ordinary or necessary repairs, and the like. I therefore charge you that there is no evidence in this cause tending to show a violation of this condition, and hence a recovery by the plaintiff cannot be defeated by reason of this objection.

"No. 3. As to whether there has been an increase of hazard or violation of the terms of the policy within the meaning of its terms as understood and contemplated by the parties, I instruct you that, in determining whether or not there has been an increase of risk, it is essential to ascertain what the parties must be presumed to have contemplated when the insurance was made. And this involves the consideration of the usages and incidents of the risk, because where any change is warranted by the usage or usual incidents of the risk, although it in fact increased the risk, it does not come within the prohibition, because it is presumed to have been contemplated by the parties.

"No. 4. The well-settled doctrine seems to be that that which is necessary for the protection of the property or its preservation, such as ordinary repairs, by way of painting or otherwise, or that which is usual or incident

to it for the purpose for which it is employed when insured, must be regarded as within the contemplation of the parties, and excepted from the operation of any stipulation apparently to the contrary.

"No. 5. You are further instructed that the right to repair buildings is incident to the ownership and use of the property, and alterations which do not increase the risk under an insurance policy, as well as all ordinary repairs, may be made without affecting the validity of the policy. And hence, although, in making any such repairs, hazardous articles are introduced into the building, such as gasoline, oils, turpentine, paints, etc., the insurer is not relieved from liability if such articles are necessary incidents to the repairs in progress.

"No. 6. Both parties to a contract for insurance must be presumed to expect that the property will be preserved and kept in proper condition by making repairs upon it; and although the making of ordinary or necessary repairs in a reasonable way may sometimes increase the risk more or less while the work is going on, or involve the use of articles whose use in a business carried on in the building is prohibited by the policy, still the insurer would not be relieved from liability by reason of such repairs or such temporary increase of risk.

"No. 7. You are further instructed that, in the absence of an express stipulation to that effect, a contract of insurance should not be held to forbid the making of ordinary repairs in a reasonably safe way, and provisions like those we are now considering in the policy in question should not be deemed to apply to an increase of risk caused by reason of any such repairs, or to the use of an article necessary therefor or for the preservation of the property. And I instruct you that if it was reasonably necessary to remove the old paint from the building, as shown in this cause, for the purpose of properly repairing it, and that the use of the gasoline burner was reasonable and proper for that purpose, having reference to the nature of the building, the danger of fire, as well as to other considerations properly connected with the transaction, the policy would not be rendered void by reason of such use, and such use would constitute no defense to this action."

The question first presented by the charge is whether the painters employed were "mechanics" within the

meaning of the policy, so that the insured was bound to obtain the indorsement of the company upon the policy permitting the repairs, inasmuch as these workmen were engaged for more than 15 days. Plaintiff contends (1) that they were not such mechanics; (2) that, if they were, the defendant waived any breach of that condition by its letter of October 1, 1894.

Webster defines the word "mechanic" as "one skilled or employed in shaping and uniting materials, as wood, metal, etc., into any kind of structure, machine, or other object requiring the use of tools or instruments." The American Encyclopedic Dictionary defines the term as "one who is employed or skilled in the construction of materials, as wood, metal, etc., into any kind of structure or machine; one who is skilled in the use of tools or instruments; one who follows a mechanical trade for his living." In Anderson's Law Dictionary the term is defined as "a workman employed in shaping and uniting materials, such as wood or metal, into some kind of structure, machine, or other object requiring the use of tools." In Crabb's English Synonymes the distinction between a mechanic and a painter is drawn as follows: "The mechanic is that species of artisan who works at arts purely *mechanical,* in distinction from those which contribute to the completion and embellishment of any objects. On this ground a shoemaker is a mechanic, but a common painter is a simple artisan." It is apparent that the common acceptation of the term "mechanic" does not include painters, and that painting was not intended by the terms of this policy to be included in those repairs which required the assent of the company to be indorsed upon the policy. To make the case more certain upon this point, when Mr. Row, who was called by the defendant as an expert upon insurance matters, was cross-examined, he testified: "The company I represent issues a permit for repairs, general repairs. Never was called upon to issue a permit for painting alone. We

never regarded painting alone as the kind of repairs that were contemplated by the policy."

We think the court was also right in stating to the jury that, if the painters were included within the term "mechanics" as used in the policy, clearly there was a waiver of any such claim by the letter of October 1, 1894. In that letter the company admits thoroughly investigating the loss, the origin of the fire, and the attendant circumstances, and undertakes to state definitely its reasons for denying liability on the policy. It is apparent that the ground, and the only ground, upon which all liability was denied, was the use and storage of gasoline, though in the former part of the letter mention was made that men had been employed to burn off this paint. Good faith required that the company should apprise the plaintiff fully of its position; and, failing to do this, it estops itself from asserting any defense other than that brought to the notice of plaintiff. *Towle* v. *Insurance Co.*, 91 Mich. 227, and cases there cited. The defendant having specifically called the attention of the insured to its objections to paying the policy, reiterating the claim made, it limited its complaint to the use and storage of gasoline. No more definite statement could have been made, and it operated as a waiver of other causes of complaint and defenses to the action.

The next objection is to the charge of the court upon the question of the use and storage of gasoline upon the premises. In the notice attached to the plea, the defendant sets out the manner in which the policy was voided under three heads; the first referring to the increased hazard to the property by the use of gasoline torches; the second referring to the employment of mechanics for more than 15 days without the written assent of the company. The third matter of defense is set up as follows:

"That gasoline or naphtha was stored in the courthouse building covered by said policy at the time of said

fire, and had been continuously for several days immediately preceding said fire, and that no agreement was indorsed on said policy or added thereto permitting such storage; and by reason thereof, within the true intent and meaning of the provision of said policy, said policy became null and void."

The defense, then, set up by this notice, relates to the storage of gasoline contrary to the terms of the policy, and not to the use made of it by the workmen in removing the paint. The court construed this condition to mean only the habitual keeping, using, or allowing of any of these articles on the premises, and not the occasional introduction thereof for some temporary purpose connected with their occupation, such as making ordinary or necessary repairs, and the like. While it is apparent that, under the notice, the defense upon that branch of the case was limited to the storage within the building, yet the inquiry need not be so restricted. The question is fairly presented by the charge whether the storing for the purpose for which the gasoline was used was a violation of the terms of the policy; and the court, we think, properly charged the jury on that point.

In *Dobson* v. *Sotheby*, Moody & M. 90, the terms of the policy required that no fire should be kept in buildings on which the rate of insurance in that case specified was paid. A tar barrel had been taken into the barn which had been insured against fire, for the purpose of repairing the building by tarring it. No fire was ordinarily kept or made there, but a fire was lighted inside to boil the tar; and, by the negligence of a servant, the building took fire, and was consumed. The insured recovered. Lord Tenterden said that the condition in the policy must be understood as forbidding only the habitual use of fire, and not its occasional introduction, as in that case, for a temporary purpose connected with the occupation of the premises.

In *O'Niel* v. *Insurance Co.*, 3 N. Y. 122, the policy provided that—

"The true intent and meaning of the parties is that in case the above-mentioned buildings, or either of them, shall, at any time after the making and during the time this policy would otherwise continue in force, be appropriated, applied, or used to or for the purpose of carrying on or exercising therein any trade, business, or vocation denominated 'hazardous' or 'extra hazardous,' or specified in the memorandum of the special rates in the proposals annexed to this policy, or for the purpose of storing therein any of the articles, goods, or merchandise in the same conditions denominated 'hazardous' or 'extra hazardous,' or included in the special rates, then  *  *  * these presents shall cease and be of no force or effect."

In the conditions annexed to the policy, oil and turpentine were denominated "hazardous" goods, and spirits of turpentine "extra hazardous;" and house building or repairing was included within the memorandum of "Special Rates of Premium." In a suit upon the policy it was held that painting the inside of this house was not an application of the house to the purpose of carrying on the trade of house repairing, and that the oil and turpentine brought into the house for the purpose of painting it were not "stored" therein within the meaning of the clause of the policy; and the court said:

"The object of that clause was to prevent the house from being used for the ordinary deposit of hazardous goods, and not for their occasional introduction for a temporary purpose necessary to make the house tenantable as a dwelling."

In *New York Equitable Ins. Co.* v. *Langdon*, 6 Wend. 623, 628, under a somewhat similar clause, it was said:

"The only question, then, is whether the keeping of oil and spirituous liquors in the store, under the circumstances disclosed in the case, was appropriating or using the building for the purpose of 'storing' those articles, within the meaning of the policy. Everything that was kept either in the store or cellar was kept for the purpose of being retailed. The smaller vessels in the store were replenished from the larger ones in the cellar, which consisted at the time of the fire of one cask of oil, one

barrel of rum, one cask of Jamaica spirits, and one pipe of gin, from all of which more or less had been drawn for the use of the store. It appears to me that the word 'storing' was used by the parties in this case in the sense contended for by the plaintiff, viz., a keeping for safe custody, to be delivered out in the same condition, substantially, as when received, and applies only where the storing or safe-keeping is the sole or principal object of the deposit, and not where it is merely incidental, and the keeping is only for the purpose of consumption. If I send a cask of wine to a warehouse to be kept for me, that is a storing of it; but, if I put it into my cellar or my garret to be drawn off and drank, I apprehend the term would not be considered as applying."

Anderson's Law Dictionary defines the term "to store" as to keep merchandise for safe custody, to be delivered in the same condition as when received.

In *Mears* v. *Insurance Co.*, 92 Pa. St. 15, a policy on a distillery forbade the insured to keep or have on the premises petroleum, naphtha, benzine, benzole, gasoline, benzine-varnish, etc., or to keep, have, or use camphine, spirit gas, or any burning fluid or chemical oils, etc. In an action on the policy it was held that this did not prohibit the temporary taking of benzine on the premises for the cleaning of machinery, and the use of the same therefor. See, also, *Faust* v. *Insurance Co.*, 91 Wis. 158; *Lancaster Silver-Plate Co.* v. *Insurance Co.*, 170 Pa. St. 151.

We think it is clear that there was not such a storing of gasoline within the building as to avoid the policy, and the court was correct in its charge.

Defendant's counsel insist, further, that the use made of this gasoline in burning off the paint was a violation of the condition of the policy which provides: "This entire policy, unless otherwise provided by agreement indorsed hereon or added hereto, shall be void * * * if the hazard be increased by any means within the control or knowledge of the insured." Considerable testimony was introduced tending strongly to show that it was the custom of painters, and had been for many years

prior to the issuing of the policy in suit, to use these torches in removing paint; and the court submitted that· question fairly to the jury.

In Wood on Fire Insurance (2d Ed., § 253) the rule is stated:

"In determining as to whether or not there has been an increase of risk, it is essential to ascertain what the parties must be presumed to have contemplated when the insurance was made, and this involves a consideration of the usages and incidents of the risk, because, if the change was one warranted by the usages or usual incidents of the risk, although it in fact increased the risk, it does not come within the prohibition, because it is presumed to have been contemplated by the parties."

In *First Congregational Church* v. *Insurance Co.*, 158 Mass. 475, and also reported in 19 L. R. A. 587, it appeared that the church edifice was being repainted on the outside. It was built of wood, and had been painted and sanded. The paint had peeled and curled at the time of the fire, and for some time prior thereto the old paint was being taken off by the use of naphtha in torches similar to the ones in the present suit. The building was destroyed by fire after the workmen had been thus employed for nearly a month, and when the work was nearly completed. The policy provided as follows:

"This policy shall be void if, * * * without the assent in writing or in print of the company, * * * the situation or circumstances affecting the risk shall, by or with the knowledge, advice, agency, or consent of the insured, be so altered as to cause an increase of such risk; or if camphine, benzine, naphtha, or other chemical oils or burning fluids shall be kept or used by the insured on the premises insured, except that what is known as refined petroleum, kerosene, or coal oil may be used for lighting," etc.

The court said:

"On the undisputed facts as stated in the bill of exceptions, the only ground on which the plaintiff could fairly ask to present a question to the jury is upon its conten-

tion that the use of the naphtha and the change in the conditions affecting the risk occurred through making ordinary repairs in a reasonable and proper way, and that in the provisions quoted from the policy there is an implied exception of what. is done in making ordinary repairs. It is generally held that such provisions are not intended to prevent the making of necessary repairs, and the use of such means as are reasonably required for that purpose."

The court further said:

"The making of ordinary repairs in a reasonable way may sometimes increase the risk more or less while the work is going on, or involve the use of an article whose use in a business carried on in the building is prohibited by the policy. In the absence of an express stipulation to that effect, a contract of insurance should not be held to forbid the making of ordinary repairs in a reasonably safe way, and provisions like these we are considering should not be deemed to apply to an increase of risk or to a use of an article necessary for the preservation of the property. We are therefore of opinion that if the use of naphtha at the time and in the manner in which it was used was reasonable and proper in the repair of the building, having reference to the danger of fire as well as to other considerations, it would not render the policy. void."

Some question. is raised in reference to the admission and rejection of the testimony of witnesses, which we have carefully examined, but find no error in the record. The only question of fact in the case was fairly submitted to the jury, and we think the charge of the court contained a correct statement of the principles of law involved.

The judgment will be affirmed.

McGRATH, C. J., and MONTGOMERY, J., concurred with LONG, J. HOOKER, J., took no part in the decision.

GRANT, J. (*dissenting*). The contract of insurance in this case provided that it should be void "if the hazard be increased by any means within the control or know-

ledge of the insured," unless otherwise provided by agreement indorsed thereon or added thereto; "or if (any usage or custom of trade or manufacture to the contrary notwithstanding) there be kept, used, or allowed on the premises, benzine, gasoline, naphtha, or other explosives." The rate of insurance was very low. The property insured was a courthouse, standing in the center of a block with no other buildings on it.

1. It is conclusively established by the evidence, and is in fact conceded, that gasoline was kept, used, and allowed in the tower of the courthouse for 24 days; that the floor of this tower was of pine, that the timbers were of pine, and that they were as dry as tinder; that three torches or blow-pipes were used to burn the paint off from the cornice, which was constructed of pine timber on the inside and covered with galvanized iron on the outside; that these torches did set the building on fire, and cause its destruction; that the defendant was not informed that this was to be done; that its assent was not obtained; and that the proper county authorities contemplated and permitted it, and had full knowledge of the method employed while it was being done. The sole claim of the plaintiff is that this method was customary and reasonably safe, that it was a proper way of making repairs, and was contemplated by the contract of insurance. Can the above language be reasonably construed to mean that these parties contracted that plaintiff might keep, or permit to be kept, within this building, for weeks, one of the most volatile and inflammable of substances, to be used by its painters, not upon the inside, but upon the outside, of the building? There was no necessity for storing it there. It could as well have been kept outside the building. It was, possibly, a little more convenient for the painters to keep it in the tower; but convenience is not the test, but reasonable necessity. Where the insured seeks to avoid the plain terms of his policy upon the ground of repairs, it certainly is incum-

bent upon him to show some necessity for the methods
employed.

The following authorities are relied on by the plaintiff:
*Dobson* v. *Sotheby,* Moody & M. 90; *O'Niel* v. *Insurance Co.,*
3 N. Y. 122; *New York Equitable Ins. Co.* v. *Langdon,* 6
Wend. 623; *Mears* v. *Insurance Co.,* 92 Pa. St. 15. In
neither of these cases was the language of the policy like
that in the present case. In *Dobson* v. *Sotheby,* it appears
that there was no agreement in the policy, but the rate of
premium was the lowest rate, and only payable for build-
ings of a certain description wherein "no fire is kept."
The court held that this language applied to habitual
fires, but said: "If the company intended to stipulate,
not merely that no fire should habitually be kept on the
premises, but that none should ever be introduced upon
them, they might have expressed themselves to that
effect." Is there any difference in meaning between the
terms "allowed" and "introduced?" As used in this con-
tract, "to allow," as defined by Webster, means "to per-
mit; suffer; tolerate." Will it be contended that if, in
that case, the policy had provided that no fire should be
kept, used, or allowed in the building, the court would
have held, as it did, that it was proper to make a fire to
heat tar?

In *O'Niel* v. *Insurance Co.,* the policy forbade the *storing*
of hazardous or extra hazardous goods. The property
insured was a private dwelling. Painters were painting
the inside of the house, and brought into it, and kept
there while the work was going on, the necessary mate-
rial,—paints, oil, and turpentine. It was held that the
object of that clause was to prevent the house from being
used for the ordinary deposit of hazardous goods.

In *Mears* v. *Insurance Co.,* the provision in the policy
was as follows:

"If the assured shall keep or have, in any place on the
insured premises where this policy may apply, petroleum,
naphtha, benzine, benzole, gasoline, benzine-varnish, or

any product, in whole or in part, of either; or gunpowder, fireworks, nitroglycerin, phosphorus, saltpeter, nitrate of soda; or keep, have, or use camphine, spirit gas, or any burning fluid or chemical oils, without written permission in this policy,—then, and in every such case, this policy shall be void."

The plaintiff purchased 8 or 10 gallons of benzine and a small quantity of carbon oil, and stored them in his bonded warehouse, situated some 40 or 50 yards distant from the insured premises. His workmen carried the benzine in a small tin can from the warehouse to the distillery, and used it in cleaning the machinery. The court held that the words "keep or have" were intended to prevent a storage either permanently or habitually, and that bringing a prohibited article upon the premises upon a single occasion, and for the sole purpose of cleaning machinery, was not keeping or having it there, within the meaning of the policy. Stress was laid upon the fact that the benzine was not kept on the insured premises during the period of its use, but was stored in the bonded warehouse. Upon the other point, the court said:

"The use of benzine is not prohibited, in terms. If prohibited at all, it must be because benzine comes within the description of burning fluid or chemical oils which, in their nature, are like camphine or spirit gas, and there was no proof that it is of like nature."

In *New York Equitable Ins. Co.* v. *Langdon,* the two defenses were that the business of a grocer was hazardous because he kept liquor and oil, and because he kept these articles for the purpose of retailing. It was held that the term "storing" meant a keeping for safe custody, and not where the grocer kept them for retail.

We are cited to no authorities, nor have I been able to find any, where the provision that these articles shall not be "used, kept, or *allowed*" upon the premises has been construed to cover a case like the present. If the plaintiff had permitted these painters to keep gasoline in

the courthouse for three weeks, while they were painting the property of some other person near by, or some other county building, it would, under all the authorities, have rendered the policy void. The danger would have been no greater in those cases than in this, and apparently there was in this case no greater necessity for such keeping. The language of this contract is clear and unequivocal. It clearly forbids certain acts, to which the plaintiff agreed, under the penalty of the forfeiture of his policy. To hold that they were not forbidden is, in my judgment, directly contrary to the plainest and most unequivocal language, and imposes a contract upon the parties which they never made.

2. It requires no testimony to inform anyone that the application of an intense flame to dry pine wood is dangerous and hazardous. A thin coat of galvanized iron was placed over the woodwork upon this cornice. Upon this iron was blown a flame of intense heat. It is common knowledge that, if there was a hole or an open seam in this sheet iron, the flame would penetrate, and set fire to the wood inside, and also that it would quickly heat the thin iron sufficiently to ignite the wood with which it was in contact. There is no testimony that this flame was not applied with due care, upon the assumption that it was proper to apply it at all. It is conceded that it set fire to the building, and that it was thereby destroyed. Either there was some hole or defective seam through which the flame entered, or else the iron was so heated by the application of the flame that it set fire to the woodwork. It is, therefore, established that, notwithstanding the care used by the painters, the use of the flame was dangerous, increased the hazard, and destroyed the building. It is insisted, however, that this is a customary and proper method of removing old paint from buildings, and this brings us to an examination of the testimony. On account of the importance of the case in the construction of insurance contracts, and the—to

me—strange claim of the plaintiff, I give the substance of the entire testimony on the use of these torches.

Mr. Samuel H. Row, who was commissioner of insurance of this State for 12 years, and has been the general agent for an insurance company in this State for 10 years, testified that he never knew paint to be burned off a building before, did not know that it was customary to do so, and that no company would write insurance knowing that it was to be done, and that the increase of hazard was so great that his company would at once have canceled the policy had it known what was to be done, and that in his judgment it was a material increase of hazard. Mr. Cornell and Mr. Tillotson, both of whom have been State agents for 18 to 20 years, gave similar testimony. No one, experienced or inexperienced in the insurance business, has given any testimony tending to show that insurers have ever voluntarily assumed such a risk.

Mr. Sleater, who had the contract to paint the building, testified that he could not tell whether or not any seams were open in the cornice; that he never made an examination; that this was a proper way to remove the paint, and it could not have been done in any other way in 10 years.

"I couldn't tell exactly how long it was necessary to direct the blaze upon the paint in order to blister it up. It was very soon,—according to how much you could turn off. You could rig that lamp so that it would take up one-half hour or a quarter of a minute. The ordinary way, we worked right along with it, using it in one hand and taking the knife in the other, and passed right along. * * * I got one of these torches of Mr. Hill, and one of Mr. Woodbury. Mr. Woodbury is a plumber in this city, and Mr. Hill is a painter. I had none of my own. I have been painting 22 years, and never owned a torch,— not that kind of a torch. I never used this one before I used it on this building,—not that kind of a torch. In my profession or trade as a painter, I never used a gasoline torch in painting before. In my 22 years' experience,

this was the first time I had occasion to use a gasoline
torch, and I guess it is not very common to use such
torches in small towns. I have heard of them being used
in Charlotte before. I have never seen them in use, until
I was shown this one, and how to use it. I was never
called upon, in my 22 years' practice, to take off that
kind of paint before. I presume that kind of a torch
would be more liable to set fire to a building than if the
torch had not been used; yes, sir, likely it would. The
flame went with a good deal of force,—with some force.
If it got in back of the—through the joints, and got in
back of the galvanized iron, it would be right on the tin-
der box, I presume. * * * I have burned the paint off
two buildings in Charlotte; off two buildings in my 22
years' experience. Two buildings, and this was one of
them; one other besides this building. I burned off what
there was, just a small portion of it. It was in front of
a store where it had scaled. With the exception of one
front of a store and this building, I had never done any-
thing of that sort in 22 years."

The front of this store was of solid iron.

Francis Horn was a painter, and worked for Mr. Sleater
on this building, and was working on it when it took fire.
He testified:

"In this lamp, when full, I had a quart of gasoline.
We put in a quart, and this air pump would force the air
under the gasoline, and around in some way, so as to
force it out the top. That would generate the gas, and
it would be this gas that would burn. It would be hard
to tell how long a flame that would make. We might
pump it full, or as full as you could, and force through a
flame five or six inches. The flame would depend upon
how hard you work the pump. I suppose it is a good
deal upon the same principle of the blow-pump used by
jewelers in welding their jewelry. It creates a hot flame.
In order to remove the paint, you would have to make
this hot enough to blister the paint. I had been using
the torch around the cornice from the beginning. Had
been using it something over three weeks at the time of
the fire. I found a place on the cornice where this gal-
vanized iron was broken off. I found no places where
the seams had opened; only where it had come clear off.

There were two places, I believe, where it had come clear off. That was in behind the wood. I noticed places there where the sparrows had taken up trash or straw in the cornice. I found it there. I didn't notice other places until after the fire. In the eagle, I believe, there was some which I discovered after the fire. I did not burn the paint off from those. * * * There were three torches used on the job. They were all gasoline torches. We used a gallon, or a little over, per day. We averaged a gallon per day during all the time. We kept the gasoline in the tower at the courthouse. We kept a five-gallon can of it. When we would use up five gallons, we would go and get it filled again, and bring it up there, and put it in the tower of the courthouse, and use out of it until it was all gone. One of these lamps took two people to use it. It didn't pump air in the same way as the one I used. They used a rubber pump, and I used a metal. It took one to hold, and the other to scrape off. They didn't have to pump it. They pumped it full, and let it go. Would have to fill them very often; about four times a day."

Philip Wareham was walking along the street just before the fire, saw Mr. Horn working with the blow lamp, and could hear the noise of it upon the street.

Plaintiff introduced as a witness one Michael Wolf, a painter from Grand Rapids, who testified that—

"We use those lamps on any kind of a building,—on wooden buildings. Been in the habit of using them for the last 15 years, that I can remember. We keep them as a part of our outfit for work. We have got a half dozen in our store now for that purpose. I know of no other way of removing the paint from cornice work of a building, where it is sanded and it is flaky. This is the only proper way to do it as I know of, or anybody else that I heard of. Used them right along for 15 years every summer and spring. Generally carry a lamp right along with us. That is, the outside work. Sometimes use them on the inside, where there is paint to be burned off. I never heard of an accident occurring from the use of these lamps. I never had one, and I never heard of one. I don't see any danger in them. They cannot explode. I would consider it perfectly safe to use one of those lamps for

the purpose of removing paint. I know of no other way to remove it, unless they tear the cornice down and put on a new one. There would be no such thing as scraping it off, not in a building of this kind. It would take a man all his lifetime, and then he could not do it proper. By the use of these lamps, we do not heat the paint very hot. You have got to hold the lamp until the paint kind of bubbles, and you follow right along with the scraper, and take the paint off as you go along. You can go in carriage shops, or in any shops, and you will find them burning lamps. They use them in carriage shops for burning off old paint,—when the buggies crack and chip off, to blister it."

On cross-examination, he testified:

"I burned all the paint off a wooden building, and didn't set it on fire. I did not think that a bit remarkable. A man has got to be careful. There is no more danger in burning it off than if you do not burn it off, unless a man is careless. That depends on the man, on a wooden building. Of course, we do not use an inexperienced man to burn off paint. If a man works alone, and nobody else around him, there might be danger, then, if he leaves the lamp on one spot, maybe 10 or 15 minutes. That makes it dangerous. *It is dangerous if a man is inexperienced, and is using it on a wooden building. I will admit that it is dangerous on any building where the flame is liable to come in contact with the wood, or liable to come in contact with trash or straw, or anything of that kind.* There is danger, if you hold the torch 10 or 15 minutes. *It is liable to set a fire on a frame house.* * * * You can throw a flame eight inches out of the nozzle. It makes a roaring sound. During the last year I have burned paint off from about five houses,—this last summer, in Grand Rapids. I have no idea how many houses I have painted during last summer,—a good many. We burned the paint off one house last year on Madison avenue, that belongs to Mr. Alexander Kennedy. We burned off some paint on the inside; burned the paint off four rooms. *That is the only house we burned off last summer.* It is a common thing to burn off the paint where it is necessary. It is necessary a good many times, but the people do not want to pay for doing it. They like to have it done, all right, if we do it for nothing.

*Only burn the paint off one out of a hundred.* I remember using these gasoline torches 14 years ago. That is the first I knew about them. I do not know how they removed the paint before that. They burned it off before I ever started to burn off. They removed it, before that, by setting it afire by turpentine, soaking it up. Used to use lye in taking paint off then,—rubbed the lye over it, and scraped it off. You could not use lye on the cornices, because the lye gets into your eyes."

One H. Bower, a witness for the plaintiff, testified that he had assisted in painting the courthouse, and that he saw the lamp described as having been used by Mr. Horn.

"I know when it was ordered; I guess, the first time it was filled. Fred Hill ordered it. I told him where to order it, and he sent and got it. It was the time that they burned off Jerry Mikesell's front, or Lamb & Spencer's now. I do not know whether three or four years ago, —two or three years ago; I could not say. That was an iron front. It was not galvanized iron. I had some experience here in the city myself in burning off paint when I went away. I burned off buggies, and some furniture and doors. We used the lamp for that purpose. We used the hot iron some too,—blistered the paint. I worked in Chicago for seven years.

"*Q.* Do you know of any way they employ for the purpose of removing paint off cornice work, and off buildings, where it is peeling, and it becomes necessary to remove the paint, except by the use of these lamps?

"*A.* No, sir; not successfully. They are used there among those painters almost constantly. Burning it off is the only practical way. We have taken it off with lye and varnish, and sometimes with naphtha and benzine. They are not using that as much at present; not as much as they are burning it off. That is the only proper way for taking it off. I do not think you could use lye effectually on the cornice of this building. Taking that paint off, in order to repaint it, by the use of one of these lamps, is the only way that I know of taking it off, and, in my opinion, it was a safe way to do it. I never knew of an accident occurring from the use of these lamps and removing paint in that way."

On cross-examination he testified:

"I have used these torches to burn off paint in Chicago on Ex-Mayor Roche's house; I think the fore part of last spring. There were six or eight men in the shop that were to work there. I used the burner myself, some of the time. · There were slide doors—folding doors—in the house, that had been painted a good many times; some of the front doors; and one of the front doors was burned off. We burned the iron railing of the steps off. We burned off the barn doors. We took them out of the building. They were removed, and they were made over, and made into smaller doors. We burned them off inside the building. We took them inside, and burned them off. They were not hung in the building; they were off from the building. In addition to that, we burned off some from the wooden casing around the door or rope molding. Treated a number of houses in the city in that way. I couldn't name the houses we have treated in that way. It is very seldom we know the names of people. I could take you right to the house if I was there, but I couldn't tell you the number. When in Chicago the last time, I worked for Mr. Widdon. He does the work for insurance companies. He does work for the Aetna and the Merchants' Insurance Company in Chicago, and he does a good deal of fire work that way. Where the curtains, lots of times, a gas jet, where there were two windows together, or there was one window, where the gas jet was pretty close to the window, the window raised, and the curtains swing around, and catch fire, and burn the finish off from the casing, part of the casing would be charred; so you would have to put in a piece, and the other part, to make it like,—have to take the finish off, and make it all alike; and we use a burner of naphtha or benzine, or something or other, to take that finish off, to make like the new part. I could not give you any idea of the number I have treated in that way. I think we did a dozen jobs last summer that was burning a piece of work of the kind, and also papering. I have burned buggies off here in Charlotte. I cannot remember how many houses here. I think there is more risk where there is fire around a building than as though there was not. There is some risk in burning paint off from a building; that is, more than there would be if you did not burn it off."

Mr. Sleater was recalled as a witness for the plaintiff, and testified that he used, in removing paint, a heating apparatus of some kind,—sometimes a torch, and sometimes a charcoal box. On cross-examination, he testified:

"During all my 25 years' experience, I never removed paint from the outside of a building in Charlotte by gasoline torches. I have removed it off from doors on the outside of a building; just doors taken off from a building. *There is always more or less danger of fire. I know that gasoline is very explosive and exceedingly inflammable. It is about as dangerous as anything, as far as explosives is concerned. I do not know about the intensity of heat, but I presume it is about as hot as any.* It is volatile, and it generates gas very rapidly. The gas which it generates is exceedingly inflammable, and burns very rapidly. I have removed paint from buggy boxes and tires with gasoline torches, while the buggy was standing in the shop; put it in the shop, and applied the gasoline torch there."

It conclusively appears that no such custom existed in Charlotte, nor do I think it can be called a custom in Grand Rapids, where Mr. Wolf admits he does not use it upon one house in a hundred. He is the only witness who testifies to its use upon wooden buildings, and he does not say whether such buildings upon which he used it were isolated or not. It may be entirely safe to use it upon buggies, doors, solid iron and brick buildings, or upon window and door frames set in solid brick walls, or fences, where there is nothing back of them for the flames to reach; but, to say that it is reasonably safe to use it upon wooden buildings, and upon dry timber covered with galvanized iron, is, in my judgment, contrary to reason. We know, from common experience, that shingles, clapboards, boards, and timbers will shrink and crack, and leave spaces through which a flame of this kind would instantly penetrate, and set fire to the cobwebs, dust, and dry material within. From the garrets of many houses daylight can be seen through these cracks and crevices, under the eaves and around the

cornice. It appears to me past belief that the municipality of Grand Rapids, or Chicago, or any city, would permit the use of this flame upon wooden buildings, or those covered, in whole or in part, with thin sheets of tin or iron, in thickly-settled localities. The danger of conflagration is too great. Such use is dangerous *per se,* and no amount of expert testimony can, in my judgment, justify a finding by court or jury that it is reasonably safe. Mr. Wolf, plaintiff's principal witness, says: *"It is dangerous on any building where the flame is liable to come in contact with the wood."* Was not the flame liable to come in contact with the wood in this case? Even in the Church Case, hereinafter cited, a bucket of water was kept at hand to put out any fire which might be kindled by the flame. This, however, would be of little use if the fire was kindled within the walls. In this case, not even this precaution was taken. All the witnesses admit that it was dangerous, and increased the hazard from fire, and, even if it were customary, the unambiguous language of this contract is that the insured should not permit it. Not a single witness says that it did not increase the hazard. Is it reasonable even to suppose that the parties to this contract contemplated that the insurer should assume the risk of a flame—so hot that it would heat metal—being thrown upon the sides of this building, the interior of which was a mere tinder box? Such holding, it seems to me, is in clear violation of the terms of a contract in which there is no ambiguity, and which absolutely prohibits using, *allowing,* or keeping gasoline. Yet, courts are asked to declare that this contract contemplated using it in its most dangerous form.

The only case cited, and we presume the only one that can be found, involving this method of removing paint, is that of the *First Congregational Church* v. *Insurance Co.,* 19 L. R. A. 587, 158 Mass. 475. The provision of the policy involved in that case was that these inflammable

articles should not be "kept or used by the insured on the premises insured." The result in that case was the same as in this: the building was destroyed. In so far as that case appears to hold, even under the terms of that policy, that it was a question for the jury to determine, I cannot yield it my assent. The language of that policy, however, is not as strong as that of the policy here involved, since it did not contain the word "allowed." I concur in the following language there used:

"Was a change of this kind, increasing the risk, with the knowledge, agency, and consent of the insured, an alteration of the 'situation or circumstances affecting the risk,' within the meaning of those words in the policies? Those words imply something of duration, and a casual change of a temporary character would not, ordinarily, render the policy void under this provision. But this change had existed continuously during the working hours of every day for nearly a month, and the work was not nearly done when it was interrupted by the fire. We are of the opinion that the change of the condition was sufficiently long-continued to be deemed a change in the 'situation or circumstances affecting the risk.' In the case of *Lyman* v. *Insurance Co.*, 14 Allen, 329, it was held that an alteration of a building which increased the risk for three weeks was enough to render the policy void under a similar clause."

The editor of the Lawyers' Reports Annotated, in a note to this case, says:

" *The facts of the above case are unusual*, and the decision an important one in the law of fire insurance. The interpretation of the clause, as to the use of naphtha 'on the premises,' establishes a precedent where there seems to have been none before."

All the essential facts in the present case are undisputed, and the question was one of law for the court, and not of fact for the jury. In this connection I quote, with approval, the language of the court of appeals of New York, in *Appleby* v. *Insurance Co.*, 54 N. Y. 260, where, under somewhat similar circumstances, it was

strenuously insisted that the question was one of fact
for the jury:

"As much as we venerate and respect the right of trial
by jury, we are of opinion that the judges of the
courts, while they may be supposed to have more learn-
ing in the law, are still able to comprehend an undis-
puted state of facts with as much intelligence as any jury
that can ordinarily be impaneled."

The court held that the facts in that case were, in law,
a plain violation of the terms of the policy.

So, in *Mack* v. *Insurance Co.*, 106 N. Y. 564, the court
say:

"We have no difficulty in agreeing with the rules of
law laid down by that court, but we are quite unable to
concur in the view taken by it of the evidence. The pro-
vision of the policy governing the case is framed in plain,
unambiguous language, and its object and design are
reasonable, and free from any doubt. Certain conditions
are very generally regarded by underwriters as largely
increasing the hazards of insurance, and they, unless
corresponding premiums are paid for the extra risks, are
usually intended to be excluded from the obligation of
the policy. Such are the conditions in reference to un-
occupied houses, changes in the occupation from one
kind of business to another more hazardous, *the use of
inflammable substances in buildings*, and their occupation
by carpenters, roofers, etc., for the purpose of making
changes and alterations. These conditions, when plainly
expressed in a policy, are binding upon the parties, and
should be enforced by courts, if the evidence brings the
case clearly within their meaning and intent."

In *Liverpool & London & Globe Ins. Co.* v. *Gunther*, 116
U. S. 128, it is said:

"One of the conditions of the policy is that, if the
assured shall keep or use any of the prohibited articles
without written permission, it shall be void. Another
is that the articles named 'are not to be stored, used,
kept, or *allowed* on the above premises, temporarily or
permanently, for sale or otherwise, unless with written
permission indorsed on the policy,' etc. A violation of
these prohibitions, by any one permitted by the assured

to occupy the premises, is a violation by the assured himself. The company stipulates that it will not assume the risk arising from the presence of the articles prohibited, and, if they are brought upon the premises in violation of the policy, by one in whose possession and control the latter have been placed by the insured, he assumes the risk which the company has refused to accept."

The plaintiff does not claim that the agents of the county were ignorant of any of the terms of this policy. They were fully aware of them; this the law presumes; yet they chose to permit the application of this intense flame, the natural result of which was the destruction of their property, without even an examination, to determine whether it was probably safe to do so, without notice to their insurers, or any attempt to obtain their assent. The inside was a tinder box, and there were holes in the iron covering. I think this case is squarely within *Liverpool & London & Globe Ins. Co.* v. *Gunther, supra.*

3. I am of the opinion that a very damaging error was committed in admitting certain questions on the cross-examination of Mr. Row. The following will serve as illustrations:

"*Q.* Then if I, for any purpose, carry a bottle of benzine into my house to use for some family use, and leave it there, or keep it there for that use, my policy is absolutely void, under that clause, is it?"

"*Q.* Would you consider that a policy issued by your company, with this clause, that no benzine shall be kept or used on the premises, that if a person shall take a pint of benzine into their house, covered by such a policy, for the purpose of cleaning grease spots out of his clothing, would that void the policy?"

These questions involved pure conclusions of law. The last question did not correctly state the terms of the policy, because it left out the important term "allowed." Furthermore, it allowed the jury to compare the occasional use of these articles, and a very common use, too,

with the facts of the present case, a very unusual one, and to naturally say that, if the former one would not vitiate the policy, neither would the latter. Mr. Row had not been asked his opinion as to whether this policy was rendered void by the conduct of the insured; certainly, no one would claim that his opinion would have been competent; and yet he is required to give his opinion upon other issues not involved, and having no connection with the case upon trial.

The judgment should be reversed, and a new trial ordered.