· ·  HILT v. METROPOLITAN LIFE INSURANCE CO.

|110    517|
|s68ᴺᵂ 300|
|129    341|

LIFE INSURANCE—CONDITIONS OF POLICY—WAIVER.

> The provision of a policy of life insurance, that no obligation is assumed unless at the date thereof the assured is in sound health, is waived by the collection of premiums thereon after an inspector of the company, authorized to "lift" the policies of people who were not in sound health when their policies issued, and pay them back their money, learned of the sickness of the assured at the time the policy was issued, notwithstanding a further provision that waivers must be in writing, signed by the president or secretary of the company. HOOKER and GRANT, JJ., dissenting.

Error to Muskegon; Russell, J.  Submitted June 11, 1896.  Decided July 31, 1896.

*Assumpsit* by Lizzie Hilt against the Metropolitan Life Insurance Company on a policy of insurance.  From a judgment for plaintiff, defendant brings error.  Affirmed.

*Fletcher & Wanty*, for appellant.

*James E. Sullivan*, for appellee.

LONG, C. J.  This is an action upon an insurance policy issued September 10, 1894, by the defendant company, upon the life of plaintiff's husband, who died July 3, 1895.  Plaintiff recovered.  The company defended upon the ground that, at the time the policy was issued, the assured was not in sound health, but was ailing from a disease of the spine, which continued, and caused his death, and that the plaintiff was not entitled to recover, because of the proviso in the policy that "no obligation is assumed by this company prior to the date

hereof, nor unless, on said date, the assured is alive and in sound health."

The plaintiff was called as a witness, and, on cross-examination, was shown the proofs of loss, which had been signed by her, and which she identified. These proofs were put in evidence by the defendant. In them the plaintiff had stated that her husband died of spinal trouble; that he quit work about six years before; that he complained of ill health about six years before his death, and had consulted Dr. Woodward, a physician, six years before; that the duration of his last illness was six years; and that he was confined to the house, or prevented from attending to business, about one year. Plaintiff, on redirect examination, then testified that the deceased was well at the time the policy was delivered, so far as she knew; that he was around all the time; that the reason he did not work was because he could get no work. She also emphatically denied that she made the statement, as shown by the proofs of loss, that her husband was confined to the house for about a year, and that he had been sick for six years. It appeared that these proofs of loss were prepared by Mr. Velzy, assistant superintendent of the company, who wrote down the answers of Mrs. Hilt; that she was German, and could not read English, and, as she explains, did not "understand high words." Mr. Velzy admitted that, after he got her signature to the statement, he did not read it over to her, but says, "She could have read it if she had wanted to," but claims that he read the questions to her, and put down the answers as she made them.

Plaintiff also introduced the statement of the attending physician at the time of death, Dr. Gordon, by which it was shown that the cause of death was: (1) Chief or primary, spinal disease; (2) contributory or secondary, general debility. Dr. Gordon testified that he had been attending deceased since March of the year he died, that physicians were able to tell how long a disease had lasted only from a *post mortem* examination, and that he had

made none in this case. It also appeared that, in the application made for the policy by the deceased to the company, no allusion whatever is made to the condition of the health of the applicant, and the only reference to this subject is found in the provision of the policy before quoted, except a statement accompanying the application by the agent who secured the business for the company, in which he says:

"Said life has stated to me that the said life has never been rejected by this or any other company, and has always had, and now has, good health, and has never been attended by a physician for any serious injury or disease or illness, and has never had any pulmonary disease, or chronic bronchitis, or disease of the heart, liver, or kidneys, and that neither parent or any brother or sister of said life has died of any pulmonary disease or bronchitis, or any scrofulous, except as follows: * * * All questions answered satisfactorily, and I recommend to and request of the company the issue of a policy of insurance on said life as applied for."

The court submitted to the jury the question of the deceased's state of health at the time the policy was applied for; stating that, if they found that the assured was in sound health at the time the policy was delivered, the plaintiff was entitled to recover, but if, on the contrary, the assured was not in good health at that time, the policy was void. Under the evidence, we think the court was not in error in submitting this question to the jury.

It is also claimed on behalf of the plaintiff that, if the deceased was not in sound health at the time of the application for the policy, the condition was waived by the defendant. The court permitted the plaintiff to testify to the following, under objection of defendant's counsel:

"Q. Mr. Parker was one of the men that came to see you to get your money?
"A. Yes, sir. When I had mine insured, and my chil-

dren, they sent a doctor to examine me. With Mr. Hilt, they didn't.

"*Q.* Did Mr. Parker speak to you about your husband's health some time before his death?

"*A.* Not as I know of.

"*Q.* I want you to recall. You had a conversation with me concerning the health of your husband. Did he introduce any man to you as the head man of the company?

"*A.* Oh, yes; I didn't know what you meant.

"*Q.* When was that?

"*A.* Oh, about two months or so before the time. I can't swear to it,—just the time.

"*Q.* About two months, you think? Did you have a talk with that head man?

"*A.* Yes, sir.

"*Q.* Where was that?

"*A.* In my kitchen.

"*Q.* What did he say to you?

"*A.* He said—    *    *    *

"*The Court:* What did you say this man Parker did?

"*A.* He was the next agent, when Lucas didn't come any more.

"*The Court:* What did he come for?

"*A.* After money."

(Here followed an explanation of counsel of the method of conducting the defendant's business, by which, in collecting the premiums, if one agent was discharged, or quit, his book was transferred to another agent, who went around and did the weekly collecting,—in this case, 15 cents.)

"*The Court:* You concede this man Parker had authority to do that?

"*Defendant's Counsel:* I haven't any reason to doubt it. I presume likely it is so. We do not concede he had any other authority, though.

"*The Court:* What did you say he said,—this man Parker?

"*Counsel:* She said he introduced her to a man that he called the head man of the company.

"*A.* Yes; he fetched the head man there. He told me he come to see me, and I told him all right, and he come.

"*The Court:* Go on.

"*A.* He says, 'Mrs. Hilt, do you think it was right to

have your husband insured?' and I told him I didn't know nothing about it.

"*Counsel:* Was there anything further said?

"*A.* And he said if I thought there was any fraud. I told him I didn't know nothing about it, on my side; I didn't know; if he thought so, it was not me. That is what I said.

"*Q.* About how long was that before your husband died, as near as you can fix it?

"*A.* On my knowledge, about two months or so,—a little more. I don't know.

"*Q.* Did you have any hot words with him? Did you get warm,—you or him?

"*A.* Yes; it made me mad when he said I was a fraud, a swindler. I told him I was not; it was his business, not mine.

"*Q.* That was in your kitchen, after you had been introduced to him by Mr. Parker?

"*A.* Yes.

"*Q.* Did they come around and collect the weekly premiums after that?

"*A.* Yes."

The witness also testified:

"I paid the premiums on this policy, three days before he died, to Mr. Parker, the agent of the company."

Mr. Velzy was sworn for the defendant, and testified that he was one of several thousand assistant superintendents, who were said to be "just a rank higher than an agent in the town;" that their work was to do office work in their offices, and occasionally to visit policy holders and examine receipt books, to see that agents had turned in to the company all collections made; that he had not heard Hilt was sick until the man from the home office—Mr. Shafer—was there; that this man was a home inspector, and that the business of such inspector was to go around and get the date of the last payment, from the receipt books, to see if the agents had turned in all the money collected,—also, to see if there were any impaired healths in the district; that it was his duty to lift those policies, and pay the people back their money.

Plaintiff's counsel claims that the above action of the defendant's agents in collecting premiums after they claimed to have knowledge of the assured's unsoundness of health, and fraud perpetrated upon the company, even though the policy did contain the provision that "its terms cannot be changed or its conditions varied except by a written agreement signed by the president or secretary of the company," was a waiver of the condition. The court evidently took this view of the case in giving to the jury the plaintiff's third request to charge,—that "the defendant could waive any condition of the policy, without an indorsement in writing, even though the policy provides that no condition could be waived except by such indorsement." The court further charged:

"If you find that this man was sick at the time the policy was issued, but afterwards, after knowing all about the health of the party, and his bodily ailments, the company assented to carry the party and carry the risk, and collected the premium, then the plaintiff will be entitled to recover."

We cannot say that there was no question of waiver to go to the jury. The plaintiff's testimony was uncontradicted that there were charges of fraud made against her by the defendant's inspector. The latter's visit to her was corroborated by Mr. Velzy; the only point of difference being that he claimed it was in the week beginning June 17th, while she claimed it was about two months prior to her husband's death. It is not denied that the company received premiums, after the inspector's visit, on this policy.

It is claimed by defendant's counsel that such evidence being taken under objection, and admitted by the court on condition that plaintiff must show that the persons she was talking with had authority to represent the defendant, and the plaintiff not having shown such authority, the court should have withdrawn the evidence from the jury. By Mr. Velzy's own testimony it is shown that Parker was the authorized agent of the company, and

it is admitted that Shafer, whom Parker introduced to plaintiff, was a home inspector. Velzy says that he heard of Hilt's sickness from the home inspector; that this man was a home inspector, whose duty it was to go around and see if there were any impaired healths, and to lift the policies of such people, and pay back their money. This was apparently the duty of Shafer. According to the testimony of Mrs. Hilt, he was at her house two months before the death of Mr. Hilt. He then knew of Hilt's impaired health, and accused Mrs. Hilt of being a swindler. The knowledge of Hilt's condition before the policy was issued was known to Shafer, who had the right, and whose duty it was, to lift the policy; and yet the moneys were collected on the policy for at least two weeks thereafter. These acts constituted a waiver, under the rule stated in *Beebe* v. *Insurance Co.,* 93 Mich. 514 (32 Am. St. Rep. 519); *Smith* v. *Insurance Co.,* 107 Mich. 270; *Rediker* v. *Insurance Co.,* Id. 224.

The judgment must be affirmed.

Montgomery and Moore, JJ., concurred with Long, C. J.

Hooker, J. (*dissenting*). The plaintiff recovered upon a life policy issued September 10, 1894, upon the life of her husband, who died on July 3, 1895. The premium was payable weekly, in installments of 15 cents. The policy contained the proviso that "no obligation is assumed by this company prior to the date hereof, nor unless, on said date, the assured is alive and in sound health." The company defended upon the ground that, at the time the policy issued, the assured was not in sound health, but was ailing from a disease of the spine, which continued, and caused his death. This was not admitted, but it was claimed upon behalf of the plaintiff that, if it were true, the condition was waived by the defendant. Both questions were left to the jury, and a verdict was returned for the plaintiff. Counsel asserts that there

was no testimony to the effect that spinal disease consti-
tuted unsoundness of health; but we think that where, as
in this case, it appears that such disease was of several
years' standing, and continued until death resulted, it is,
in the absence of proof to the contrary, sufficient evi-
dence of unsound health nine months before death.   This
appears, not only from the statements contained in the
proof of loss, but by the testimony of the plaintiff herself
upon the witness stand.   We think that the unsoundness
of health of the assured at the time the policy was issued
was conclusively proved, and that the question should
not have been left to the jury.

Was there testimony which could support the claim
that the condition was waived?   Counsel for the plaintiff
asked her the question:

"*Q.* Did you have any talk with any of the agents,
concerning your husband, when he was sick?   (Objected
to by counsel for defendant as incompetent and imma-
terial.)

"*The Court:* The reason that you claim that this evi-
dence might be proper would be if they want to make
any defense because there were certain statements that
weren't true, or something of that kind?

"*Mr. Sullivan:* Yes; if they claim under a certain
clause in the policy.

"*The Court:* But you claim they waived it?

"*Mr. Sullivan:* Yes; by accepting the premium.

"*The Court:* As I understand it, your proposition is
to show, after they had full knowledge of the fact, that
they received your money.   Is that about it?

"*Mr. Sullivan:* After they had notice or knowledge
of any sickness that Mr. Hilt had, they received our
money,—yes, sir; and by receiving our money they are
now estopped, and waived any condition in the policy to
that effect.   Will the evidence be received, your honor?"

The court permitted the witness to answer, and the ex-
amination proceeded as follows:

"*Q.* Mr. Parker was one of the men that came to see
you to get your money?

"*A.* Yes, sir.

"*Mr. Potter:* We would like to have all this testimony received under our objection and exception.

"*The Court:* All right.

"*A.* When I had mine insured, and my children, they sent a doctor to examine me.    With Mr. Hilt, they didn't.

"*Q.* Did Mr. Parker speak to you about your husband's health some time before his death?

"*A.* No, not as I know of.

"*Q.* I want you to recall.    You had a conversation with me concerning the health of your husband.    Did he introduce any man to you as the head man of the company?

"*A.* Oh, yes; I didn't know what you meant.

"*Q.* When was that?

"*A.* Oh, about two months or so before the time.    I can't swear to it,—just the time.

"*Q.* About two months, you think?    Did you have a talk with that head man?

"*A.* Yes, sir.

"*Q.* Where was that?

"*A.* In my kitchen.

"*Q.* What did he say to you?

"*A.* He said—

"*Mr. Potter:* I understand—

"*The Court:* As I understand, this man Parker was the man who took your policy,—made out the policy for you first?

"*A.* Mr. Lucas is the first man.

"*Mr. Sullivan:* They have several agents here in the city.

"*The Court:* What did you say this man Parker did?

"*A.* He was the next agent.    When Lucas didn't come any more, then Parker came as agent,—the second agent.

"*The Court:* What did he come for?

"*A.* After money.

"*The Court:* Was he the same party to whom you gave this other paper?

"*A.* Yes, sir.

"*The Court:* When you notified him of the death?

"*A.* No; that was that man,—Mr. Velzy.

"*Mr. Potter:* Perhaps, with a slight explanation, I can make it plain to the jury and all of us: They have agents whose business it is to collect these weekly premiums,

and if one agent, for any reason, is discharged, or quits, his book is transferred to some other agent, and that agent then goes around collecting the weekly premiums. This branch of the business, it is called the 'Industrial Branch,' and weekly premiums are collected,—in this case, 15 cents a week. If the agent who took the policy originally leaves the service of the company, somebody takes his place, and takes his book and goes around and makes the weekly collections.

"*The Court:* You concede this man Parker had authority to do that?

"*Mr. Potter:* To make the collection?

"*The Court:* Yes.

"*Mr. Potter:* I haven't any reason to doubt it. I presume likely that is so. We do not concede that he had any other authority, though.

"*The Court:* What did you say he said,—this man Parker?

"*Mr. Sullivan:* She said he introduced her to a man that he called the head man of the company.

"*A.* Yes; he fetched the head man there. He told me he come to see me, and I told him all right, and he come.

"*The Court:* Go on.

"*A.* He says, 'Mrs. Hilt, do you think that was right, to have your husband insured?' and I told him I didn't know nothing about it.

"*Mr. Sullivan:* Was there anything further said?

"*A.* And he said if I thought there was any fraud. I told him I didn't know nothing about it, on my side; I didn't know; if he thought so, it was not me. That is what I said.

"*Q.* About how long was that before your husband died, as near as you can fix it?

"*A.* On my knowledge, about two months or so,—a little more. I don't know.

"*Q.* Did you have any hot words with him? Did you get warm,—you or him?

"*A.* Yes; it made me mad when he said I was a fraud, a swindler. I told him I was not; it was his business, not mine.

"*Q.* That was in your kitchen, after you had been introduced to him by Mr. Parker? That talk was had with you in your kitchen, after you had been introduced to him by Mr. Parker. Is that right?

"*A.* Yes, sir.

"*Q.* Did they come around and collect the weekly premiums after that?

"*A.* Yes, sir."

Velzy was sworn for the defendant, and testified that he was one of several thousand assistant superintendents, who were said to be "just a rank higher than an agent in the town." Their duty was to do office work in their offices, and occasionally to visit policy holders and examine their receipt books, to see that the agents had turned in to the company all collections made. He testified that he heard that Hilt was ill, about two weeks before he died, from Charles Shafer, who was a home inspector, and who came along at that time. He was able to fix the time that Shafer was there as the week beginning Monday, June 17th, from records in his office. He stated that Shafer's duty was to go around and take the date of the last payment, from the receipt books in the hands of the assured, to see if the agents had turned in all collections; also: "If there are any impaired healths in the district,—people that were insured when the policy is issued,—it is his business to lift those policies, and pay the people back their money."

The plaintiff's case, then, hangs on the slender thread that the failure of Shafer to lift this policy, and pay back the premiums received, and the acceptance by Parker of one or two payments of 15 cents after this visit by Shafer, constituted a waiver of the condition of sound health provided by the contract. There is no evidence in the record of what Shafer knew, except as it is to be inferred from the conversation related by Mrs. Hilt. She says he asked her if she thought it was right to have Hilt insured, and she disavowed knowledge upon the subject, and that he then asked if she thought there was any fraud, and she told him she did not know; if he thought so, it was not her. Her testimony implies that he accused her of being a fraud and a swindler, and she replied that it was his business, and not hers. It is not claimed that Shafer re-

ceived any money, or that he directed any one else to. The most that can be said is that after this conversation, from which we may infer that he believed, and possibly knew, that the policy was obtained when the assured was not in sound health, he did not offer to pay back the premiums, and demand the policy. There is, in my opinion, no evidence that the home office was informed of, or acted upon, the knowledge obtained by Shafer. There is nothing to indicate that he saw Hilt, with whom the contract was made; and, if the company is to be held liable, it is to say that, when notice is brought home to one having authority to cancel policies for fraud, his failure to do so, and the subsequent receipt of money by a collector not a general agent, constitute a waiver, notwithstanding the express provision that waivers must be in writing, signed by the president or secretary of the company. We think this is not the law. The case is within the rule of *Mallory* v. *Insurance Co.*, 97 Mich. 416; *Cleaver* v. *Insurance Co.*, 65 Mich. 527 (8 Am. St. Rep. 908). See, also, *Bourgeois* v. *Insurance Co.*, 86 Wis. 402; *Pitney* v. *Insurance Co.*, 65 N. Y. 6; 2 Biddle, Ins. § 1081; 2 May, Ins. §§ 507, 508.

The judgment should be reversed, and a new trial ordered.

GRANT, J., concurred with HOOKER, J.