ST. PAUL FIRE & MARINE INS. CO. v. PENMAN.

(Circuit Court of Appeals, Third Circuit. February 25, 1907. On Rehearing
April 11, 1907.)

No. 53.

**1. INSURANCE—CONDITIONS OF FIRE POLICY—KEEPING OF EXPLOSIVES.**

A provision of a fire insurance policy, making it void if, without permission indorsed thereon, there should be kept or allowed on the insured premises "benzine, benzole, dynamite, ether, fireworks, gasoline, Greek fire, gunpowder exceeding twenty-five pounds in quantity, naptha, nitroglycerine or other explosives, phosphorous or petroleum or any of its products of greater inflammability than kerosene oil of the United States standard," must be construed to include blasting powder by the words "other explosives," in the absence of evidence showing that it is of less explosive force than any one of the substances enumerated, and therefore not in the same class.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 782, 784.]

**2. SAME—ACTION ON POLICY—EVIDENCE.**

A fire insurance policy provided that it should be void if, without written permission indorsed thereon, there should be allowed or kept on the insured premises any one of certain enumerated substances, "or other explosives"; also, that no officer or agent of the insurer should have power to waive such provision, except in writing indorsed thereon or attached thereto. No indorsement was made on the policy. Blasting powder, which was not one of the explosives enumerated, was kept on the premises by tenants, and from an explosion of such powder the building took fire and burned. Held, that in an action on the policy it was error to admit parol evidence to show that the agent who placed the insurance knew that the building was to be occupied by miners as tenants, and that they customarily kept blasting powder in their dwellings, and that he charged more than the usual premium on that account; the tendency of such evidence being to establish a waiver contrary to the terms of the policy.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 952, 955, 985, 1687.]

Holland, District Judge, dissenting.

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

W. K. Jennings and D. C. Jennings, for plaintiff in error.

A. J. Truitt and B. M. Clark, for defendant in error.

Before GRAY, Circuit Judge, and HOLLAND and LANNING, District Judges.

LANNING, District Judge. The defendant in error commenced this action against the plaintiff in error to recover the amount of an insurance policy issued by the plaintiff in error to the defendant in error on February 4, 1904. The building covered by the policy was destroyed by fire on December 7, 1904. It had been occupied by tenants who were miners, and who were keeping in it, for use in their trade, blasting powder. One of the tenants accidentally threw a lighted fuse into an open can of blasting powder, which resulted in an explosion and the fire. The defendant in error recovered a verdict and judgment,

151 F.—61

and the plaintiff in error now seeks to have the judgment reversed because of alleged errors in the trial of the action.

The policy contains these provisions:

"This entire policy, unless otherwise provided by agreement endorsed hereon or added hereto, shall be void * * * if (any usage or custom of trade or manufacture to the contrary notwithstanding) there be kept, used or allowed, on the above described premises, benzine, benzole, dynamite, ether, fireworks, gasoline, Greek fire, gunpowder exceeding twenty-five pounds in quantity, naptha, nitro-glycerine, or other explosives. * * * This policy· is made and accepted subject to the foregoing stipulations and conditions, together with such other provisions, agreements or conditions as may be endorsed hereon or added hereto, and no officer, agent or other representative of this company shall have power to waive any provision or condition of this policy except such as by the terms of this policy may be the subject of agreement endorsed hereon or added hereto, and as to such provisions and conditions, no officer, agent or representative shall have such power, or be deemed or held to have waived such provisions or conditions, unless such waiver, if any, shall be written upon or attached hereto, nor shall any privilege or permission affecting the insurance under this policy exist or be claimed by the insured unless so written or attached."

The trial court permitted parol testimony to be given to the effect that the local agent of the insurer, Mr. Brown, by whom the policy · was delivered to the insured, knew, at the time of its ·delivery, that the building would soon be ·occupied by miners as tenants, and that it was the custom of miners to keep blasting powder in their houses, and that because of these facts Mr. Brown charged the insured a rate of insurance higher than the customary rate for tenement buildings. There was no proof that the insured knew that she had paid more than an ordinary rate for her insurance, and there was nothing on the face of the policy that showed it. Other testimony was admitted to prove that dynamite and gunpowder are more powerful explosives than blasting powder. In the charge to the jury, the trial court said:

"Now, gentlemen, it is alleged that blasting powder was included among these articles by the term 'other explosives.' Ordinarily it is the duty of a court to construe a written instrument, and instruct the jury what the terms mean. But in this case, under the facts and·proofs here, bearing in mind the words of the policy and the testimony of Mr. Brown in reference to this property being used as a miners' house, and the testimony that miners are in the habit of keeping blasting powder on the premises, and also the testimony in regard to the fact that an extra charge (if such be the case) was made in this case by reason of the fact that it was a miners' residence, we have decided to leave it to you, as a question of fact for you to determine, whether, under the evidence and the facts proven here, blasting powder is included in the term 'other explosives.' In other words, whether it was the intention of the insurance company, when it issued this policy through Mr. Brown, to provide therein that, if blasting powder was kept, used, or allowed on the premises, the policy was to be void and of no effect."

If the language of the policy on the point of keeping blasting powder on the insured premises is obscure, it was proper to admit parol testimony to explain its meaning, and to submit to the jury, as a question of fact, any disputed question concerning its meaning. Otherwise, as stated by the court in the charge, it was the duty of the court to construe the language. The counsel for the defendant in error contend that the proof that blasting powder is an explosive of lower power than dynamite or gunpowder requires the words "or other explosives" to

be limited in meaning so that they shall include no substance of lower explosive power than gunpowder. But we think that such an application of the maxim "noscitur a sociis" is too narrow. The general words "or other explosives" are associated not alone with dynamite and gunpowder, but also with benzine, benzole, ether, fireworks, gasoline, Greek fire, naptha, and nitro-glycerine. For aught that appears in the record of the case, some of the specifically prohibited substances are explosives of lower power than dynamite or gunpowder, or even than blasting powder. Greek fire, for example, is a term that was applied to explosives for centuries before the invention of gunpowder or blasting powder. In the absence of proofs on the point, it is fair to assume that Greek fire is an explosive of lower degree than gunpowder or blasting powder. There is no evidence to show the explosive power of benzine, benzole, ether, gasoline, or naptha, as compared with that of blasting powder. The relative explosive powers of these substances is not a matter of common knowledge. If blasting powder is less dangerous than some of them, but more dangerous than others, it is included in the general words as ejusdem generis with the substances that are specifically named. If its explosive power is of a lower degree than that of any of the substances specifically named, and if, for that reason, it is not ejusdem generis with the substances specifically named (a point on which no opinion is expressed), then, since the general words in their literal and natural meaning include blasting powder, the burden was on the insured to show its lower explosive power. To hold, under the present proofs, that the general words "or other explosives" do not include blasting powder, merely because it is a less dangerous explosive than dynamite or gunpowder, when it may be more dangerous than Greek fire, benzine, benzole, ether, gasoline, or naptha, is virtually to decide arbitrarily that no meaning or effect shall be given to the general words. We are satisfied that this cannot be done, and that, as the proofs stand, the general words include blasting powder.

Another point relied upon by the counsel of the insured is that the jury must have concluded that, when Mr. Brown delivered the policy to the plaintiff, he knew the building was soon to be occupied by miners, and that it was the custom of miners to keep blasting powder in their houses, and that, for these reasons, he charged a higher rate of insurance than he otherwise would have charged. Therefore, it is argued, the jury must have found that Mr. Brown intended that blasting powder should be excluded from the list of explosives which the policy prohibited the insured from keeping on the premises. The parol testimony offered had also for its purpose the proving of this alleged intention, notwithstanding the express provision of the policy that no agent of the insurer should have the power to waive any provisions of the policy, unless the waiver should be indorsed thereon. Such testimony was not admissible, unless, in the circumstances stated, the court could properly permit the jury to search elsewhere than in the language of the policy for the intention of the parties. No fraud or mutual mistake of facts is alleged. Assuming that the words "or other explosives" include blasting powder, the proposition is that the contract between the parties may be shown by parol testimony to have been something different from that expressed in the policy. While

·cases may be cited in which parol testimony has been allowed 'to modify the terms of policies of insurance, even where those policies have been ·free from ambiguity or obscurity and from fraud or mistake, the rule ·to be applied by our federal courts, at least, in the construction of such instruments, is the same as that applied in the construction of other written contracts.

In Assurance Company v. Building Association, 183 U. S. 308, at· page 331, 22 Sup. Ct. 133, at page 141, 46 L. Ed. 213, Mr. Justice ·Shiras .quoted, with approval, the following language in another case:

"To except policies of insurance out of the class of contracts to which they belong, and deny them the protection of the rule of law that a contract which is put in writing shall not be altered or varied by parol evidence of the contract the parties intended to make, as distinguished from what appears, by ·the written contract, to be that which they have in fact made, is a violation of the principle that will open the door to the grossest frauds. * * * A court of law can do nothing but enforce the contract as the parties have made it. .The legal rule that in courts of law the written contract shall be regarded as the sole repository of the intentions of the parties, and that its terms cannot be changed by parol testimony, is of the utmost importance in the trial of jury cases,. and can never be departed from without the risk of disastrous· consequences to the rights of parties."

· And on page 361 of 183 U. S., page 153 of 22 Sup. Ct. (46 L. Ed. .213), he declared that:

"Contracts in writing, if in unambiguous terms, must be permitted to speak for themselves, and cannot by the courts, at the instance of one of the parties, be altered or contradicted by parol evidence, unless in case of fraud or mutual mistake of facts," and that "this principle is applicable to cases of insurance contracts as fully as to contracts on other subjects."

To the same effect, see Modern Woodmen of America v. Tevis, 117 Fed. 372–375, 54 C. C. A. 293, and Connecticut Fire Insurance Co. v. Buchanan, 141 Fed. 877, and especially pages 895 to 897, 73 C. C. A. 111, 4 L. R. A. (N. S.) 758.

We think the policy in suit prohibited the keeping of blasting powder on the insured premises, that parol testimony was improperly admitted to vary the terms of the policy, and that the trial court should have directed a verdict for the defendant in accordance with its request.

The judgment of the Circuit Court is therefore reversed, with costs.

HOLLAND, District Judge (dissenting). I am unable to agree with the majority of the court in the conclusion at which they arrive in this case. The court below is reversed, and the reasons assigned are that:

"The policy prohibited the keeping of blasting powder on the insured premises, and that parol testimony was improperly admitted to vary the terms .of the policy, and that the trial court should have directed a verdict for the defendant in accordance with its request."

It is conceded to be a binding rule that "in courts of law the written contract shall be regarded as the sole repository of the intentions of the parties, and that its terms cannot be changed by parol testimony"; but, in the trial of this case, this principle was not in the least violated, nor was the parol testimony admitted for the purpose of varying the terms of the policy, as we view the case. Certain hazardous explosives,

specifically named, were prohibited from being kept or used upon the insured premises. Blasting powder was not named, but, following the enumeration of the explosives excluded, the phrase "other explosives" was used, and, notwithstanding the fact that blasting powder was not in terms excluded, it is now held by the plaintiff in error that blasting powder was excluded under the general terms "others explosives." The parol testimony was admitted, not for the purpose of varying the terms of the contract, but for the purpose of showing that blasting powder was not an "explosive" of the same kind as those enumerated, but was one of a much lower explosive force, and that it was a custom, arising out of the necessity of the coal mining business, for miners to keep blasting powder, in small quantities, for use in the mines, upon their premises, and that the insurance company knew this custom prevailed in this community long before and at the time this insurance was effected, and that it knew these houses were to be tenement houses in this mining district where the custom prevailed, and that the company, through its agent, Brown, collected an additional premium for the risk resulting from the recognized and known custom of keeping blasting powder upon the premises. Blasting powder not having been specifically excluded, as I shall show hereafter, it was proper to admit the evidence for the purpose of ascertaining the understanding of the parties to the contract at the time it was executed.

This judgment should be affirmed for two reasons:

First. This being a clause in an insurance policy, the language of which tends to work a forfeiture, should be construed most liberally in favor of continuing the insurance, and the general words "other explosives" should be restricted to explosives of a like kind and degree of hazard as those previously enumerated and with which the phrase is associated; and as "blasting powder" by name is not prohibited upon the premises, and falls within the class of prohibited articles only in case the general expression "other explosives," under the circumstances, can be said to include it, the court, before passing upon this question, must know the nature of "blasting powder," and any other fact or circumstance showing the intention of the insurer as to the relation of this indefinite phrase to the subject-matter of the insurance.

Second. "Blasting powder" not being expressly prohibited upon the premises, the defendant in error was entitled to show the notorious and long-established custom in this mining district for tenants to keep "blasting powder" in their houses, in reasonable quantities, for use in the mines, which practice was known to the insurer's agent, who collected a premium for this risk, and, having established these facts by uncontradicted testimony, the court should have instructed the jury that the keeping of blasting powder upon the premises, as shown in this case, did not forfeit the insurance.

From the record we gather that the plaintiff in error issued a policy of fire insurance to the defendant in error for a term of three years, from February 4, 1904, for $2,600, on a two-story frame shingled roofed building, 28x96 feet and additions, to be occupied by tenants as dwelling, and situate in Punxsutawney borough, Jefferson county, Pa., in the Elk Run addition to the said borough. A premium of $65 was paid, which was at the rate of $2.50 per $100, or about double the usual rate.

Among other provisions in this policy, the one important in the determination of this case is as follows:

"This entire policy, unless otherwise provided by agreement endorsed thereon or added thereto, shall be void if * * * the hazard be increased by means within the control or knowledge of the insured, * * * or if illuminating gas or vapor be generated in the described building (or adjacent thereto) or used therein; or if (any usage or custom of trade or manufacture to the contrary notwithstanding) there be kept, used, or allowed on the above described premises, benzine, benzole, dynamite, ether, fireworks, gasoline, Greek fire, gunpowder, exceeding twenty-five pounds, naptha, nitro-glycerine, or other explosives, phosphorus, or petroleum or any of its products of greater inflammability than kerosene oil of the United States standard."

On December 7, 1904, the property thus insured was wholly destroyed by fire. Formal proof of loss, as required by the terms of the policy, was made and forwarded to the plaintiff in error, and duly received by it. The plaintiff in error refused to pay the amount of the insurance. Suit was brought by the defendant in error in the Circuit Court of the United States for the Western District of Pennsylvania, and defense thereto was made. Among other grounds alleged was the claim that:

"There was kept, used, or allowed on the insured premises blasting powder, or some other explosive differing essentially from gunpowder, without any provision allowing the same being provided by agreement indorsed on the policy or added thereto."

The defendant in error claimed "other explosives" did not include "blasting powder," and it was so understood by the insurance company, through its agent, when the policy was written, who knew of the custom of keeping "blasting powder" by miners, and who collected a premium from the defendant in error for the risk.

At the trial, W. S. Brown, senior member of the firm of Brown Bros., insurance agents, was called as a witness, and the attorney for the plaintiff made the following offer:

"We propose to prove by the witness on the stand that he is an agent of the St. Paul Fire & Marine Insurance Company, the defendant, and placed the policy on this building that was destroyed; that he knew at the time he placed it that it was a miners' dwelling house, to be occupied by miners; that he has had 15 or 20 years' experience in placing insurance on properties of this class, and he knows, and knew at the time he placed the risk, that it was the common and ordinary custom for all the miners to keep more or less blasting powder about their premises; that he had that knowledge at the time the risk was placed; and also that the insurance company charged an increased rate on the building insured, solely on the ground that it was rated as a miners' dwelling house."

The trial judge permitted the witness to testify in support of this offer, and his testimony on this point was as follows:

"Q. Had you any knowledge, at the time you took this risk, who was to occupy the building? A. Yes; I had the knowledge that it was to be occupied by miners.

"Q. How long have you been in the insurance business? A. Twenty-three years last September.

"Q. In what particular region of the state? A. Through Clarion county and Jefferson county all the while.

"Q. Have you covered or taken a large amount of risks as agent for different companies on miners' dwelling houses? A. Yes; I have had considerable experience for coal companies in our district during that time.

"Q. And, in inspecting the risks and adjusting losses to properties of that kind, have you frequently visited mining towns? A. Yes.

"Q. What custom prevails among the miners as to having blasting powder on their premises, throughout the regions in which you have placed insurance? A. Well, it is generally supposed that miners keep blasting powder about their dwellings. I have always understood it in that way.

"Q. Don't you know for a fact? A. Yes; I know it as a fact that they do keep more or less blasting powder all the time in their dwellings.

"Q. Did you have that knowledge at the time you accepted this risk? A. I certainly had.

"Q. Was there any extra premium charged by reason of the fact that this house was a miners' dwelling house. A. Yes; there was.

"Q. State what that rate was, and explain fully, so that the court and jury will understand it. A. The minimum annual rate on coal properties given to us by the Underwriters' Association—speaking of dwellings now, coal, property, miners' dwellings—is $.75 per annum. We have the privilege to double that for three years, charge two annual rates for three years, which would be 1½ per cent. Now, this building for occupying was built in seven compartments, so that there were seven families, seven miners' dwellings. The building was built with seven compartments, to be occupied by seven different families, as I found out. I increased the rate because of the occupancy, of the number of occupants. Understand, now, we were speaking of rates on miners' dwellings, not on other classes of dwellings. The Underwriters' Association gives us a rate of 60 cents a hundred on single dwellings, or 65 cents a hundred on double dwellings, allowing us to double that rate for three years, making it $1.20 for singles and $1.30 for doubles. Now, when I came to write this risk, I looked the situation over, and I concluded, after some figuring, that I would charge $1.25 per annum, or 2½ per cent. for three years, $2.50 a hundred for three years, which I did. The building was not finished, and I charged according to the Underwriters' Association, for a finishing permit for 30 or 60 days—the policy will show which—I think 30 days, $3.90, I think, of extra premium for finishing.

"Q. As I understand you, in addition to charging a double rate for a miners' dwelling house, you added an additional rate because the dwelling house had not been finished. A. Yes; I added an extra premium. I am compelled to do that by the Underwriters' Association.

"Q. What was that extra premium that you charged for what you call carpenters' risk on an unfinished building? A. $3.90; 30 days carpenters' risk.

"Q. Now, in order to get this perfectly clear, had that house been intended to be occupied by some other laborer than a miner, what would have been the rate? A. Well, that would be pretty hard for me to answer, except in this way: I gave you the minimum rate on a single and a double dwelling. Now, I will give you the minimum rate on an ordinary house occupied by one person, and that would be 50 cents per annum, or $1 a hundred for three years.

"Q. Do you double your regular rate on this class of property by reason of the fact that it is to be occupied by miners, who use more or less blasting powder in this business? A. I almost double the annual rate on miners' dwellings."

It was further established by a great number of witnesses, running back for more than 10 years, that the universal practice in the mining regions, wherein this property was located, among miners, was to keep blasting powder in their dwelling houses. This general and universal practice was known to the agent of the insurance company who had been placing insurance upon like dwellings, the tenants of which followed a like practice for a great number of years. It was further shown by undisputed evidence that blasting powder is not the same as gunpowder, but is an explosive of a very much lower degree. Among other questions properly submitted to the jury, the learned trial judge submitted the question as to whether, under the facts and evidence proven,

blasting powder was included in the term "other explosives." On all questions submitted, the jury found in favor of the defendant in error, and returned a verdict for the amount of the insurance. This submission, among others, was filed as a reason for a new trial. This refused, an appeal was taken to this court.

There are seven assignments of error, which raise only two questions of importance in the determination of this appeal: First, as to whether the learned trial judge was in error in admitting the evidence of witnesses as to the custom, and of W. S. Brown, the agent of the insurance company; and, second, as to whether it was error in the trial judge in refusing to unqualifiedly affirm the company's third point upon which the court was requested to charge the jury. It was as follows:

"If the jury believe from the evidence that the plaintiff or her tenant or tenants kept, used, or allowed on the insured premises blasting powder, or other explosives, except gunpowder, not exceeding 25 pounds in quantity, the policy thereby became and remained void, and the plaintiff cannot recover in this case, and the verdict should be for the defendant. A. This point is affirmed, if the jury believe under the evidence 'that blasting powder was one of the articles prohibited by the clause above quoted."

There is no doubt about the fact that blasting powder, to the amount at least of a 25-pound keg, was kept upon the premises by one of the tenants. Was the keeping of blasting powder by the tenants, in quantities indicated by the evidence, prohibited by the terms of this policy? This question was submitted to the jury by the learned trial judge. The plaintiff in error was not entitled to so favorable a disposition of this question, as the jury should have been instructed that in this case the keeping of blasting powder upon the premises in the quantities and in accordance with the custom was not a violation of any of the requirements of the policy.

The explosives which the policy says shall not "be kept, used or allowed on the premises" are benzine, benzole, dynamite, ether, fireworks, gasoline, Greek fire, gunpowder, exceeding 25 pounds in quantity, naptha, nitro-glycerine, or "other explosives." This must be held to mean other explosives in the class previously mentioned and of a nature as inflammable and dangerous as the specified class, but it was not intended by the parties that "other explosives" should extend to other articles of a much lower explosive power, which in no sense could be classed among those dangerous and highly explosive articles. It is manifest that the lower explosives not named were not intended to be prohibited, because, following the words "other explosives," the policy specifies such of a lower explosive quality which are intended to be excluded, to wit, phosphorus or petroleum, or any of the products of petroleum, of greater inflammability than kerosene oil of the United States standard. In other words, the policy specifies a number of violent and dangerous explosives which are prohibited upon the premises, and adds other explosives, meaning other explosives of their nature and kind; and then follows a list of a lower degree of explosive power which the insurer elects to exclude from the premises. These are also specified, but nowhere do we find there is any exclusion of blasting powder.

From an examination of the whole policy, it is very plain that this is the proper interpretation to be given to the expression "other explo-

sives." It was evidently so intended by the insurer, as, in another paragraph, it provides for the extent of its liability where fire ensues from an explosion of any kind, by limiting it to the damage done by fire only. Now, it must have been the understanding of the insurer that, as all kinds of explosives were not excluded from the premises, there might be destruction of the property resulting from the explosion, and, in that case, the policy provides that its liability shall only extend to the damage caused by fire only, if fire should ensue. This provision indicates that the plaintiff in error did not expect the premises to be kept free form explosives, excepting those particularly specified and those of the same class, and that, in case other explosives not excluded from the premises were allowed thereon, and an explosion occurred, the company's liability should only extend to the damage done by fire alone. In accordance with the general rule that provisions relating to forfeiture should, when ambiguous, be so construed as to prevent forfeiture, the courts have, as a rule, construed the condition as to the keeping and use of hazardous articles upon insured premises liberally in favor of the insured whenever there is an ambiguity in such condition, so where the policy was intended to be void if gunpowder, phosphorus, etc., were kept on the premises, or if camphene, burning fluid, etc., were kept for sale, stored, or used on the premises in quantities exceeding a barrel at any one time without permission, the condition was construed so as to apply the clause "in quantities exceeding a barrel at any one time" to gunpowder, and thus prevent a forfeiture of the policy for the keeping of any less quantity than a barrel on the premises. Phœnix Ins. Co. v. Slaughter, 12 Wall. 404, 20 L. Ed. 444.

The insurance company writes the policy to suit the conditions of the community in which it takes insurance. It knows the elements of risk which the usage of the community where the policy is taken lays upon the company, and all provisions in the policy which tend to work a forfeiture should, as a matter of justice and public policy, be strictly construed, and the courts of last resort in every jurisdiction, both in England and in this country, have followed this practice of construing the policy strictly so as to prevent a forfeiture. Thus, for instance, though fireworks usually contain gunpowder, keeping fireworks has been held not to be a violation of the clause prohibiting the keeping of gunpowder. Tischler v. California F. M. Fire Ins. Co., 66 Cal. 178, 4 Pac. 1169. Where a statute or other document enumerates several classes of persons or things, and immediately following and classed with such enumeration the clause embraces "other" persons or things, the word "other" will generally be read as "other such like," so that persons or things therein comprised may be read as the same with, and not of a quality superior to or different from those specifically enumerated. Am. & Eng. Ency. of Law, vol. 21, p. 1012. The rule of legal construction that general words following an enumeration of particulars are to have their generality limited by reference to the preceding particular enumeration, and to be construed as including only all other articles of the like nature and quality, is usually applied to statutes giving to certain classes special privileges, and those inflicting a penalty or forfeiture; also to provisions in contracts intended to work a forfeiture; and especially is it rigidly adhered to in insurance agreements contain-

ing provisions in which general words follow particular enumerations and are inserted in clauses for the purpose of working a forfeiture of the agreement. This is the rule universally adopted by the courts.

The following cases will illustrate the application of the rule:

The leading English case is Sandiman v. Breach, 7 Barnwall & Cresswell King Bench Reports, 100, in which the rule known as "Lord Tenterden's" was announced, and has always since been invoked to define the scope and meaning of general expressions in contracts where hard and unconscionable bargains are to be carried into effect. The Chief Justice held that as carriers of a certain description, mentioned in the act, to wit, drovers, horse coursers, wagoners, and travelers of a certain description were particularly and specifically mentioned, the words "other person or persons" must be construed to be persons ejusdem generis with those specified, and cannot be used in a sense large enough to include a stage coach driver or owner. The same rule was applied to a contract by the English courts shortly after, in the case of Brooke v. Lord Kensengton, 14 Eng. Ruling Cases, 723, where Vice Chancellor Wood held that the construction of a mortgage was subject to the rule, and applied it in the case.

In the case of Alabama v. Montague, 117 U. S. 602, 6 Sup. Ct. 911, 29 L. Ed. 1000, the description in a mortgage followed the language of an act of the Legislature of Alabama, as follows: "On the telegraph line and telegraph offices along the line of the said road belonging to said company; also on the machine shops and all other property in the state and in Georgia, Tennessee and Mississippi belonging to said conpany; also on all coal mines now opened or hereafter to be opened and worked, belonging to said company; also upon all iron or other mineral lands, and all iron manufacturing establishments now in operation and hereafter to be constructed." Upon an attempt, in a foreclosure proceeding, to seize certain lots in Tennessee belonging to the company, it was held that the words "all other property" were intended to cover property of the company in and about the telegraph offices, machine shops, coal mines, iron mines, and manufacturing establishments, and did not include the lots which were not in any way connected therewith.

In United States v. Pounds of Celluloid, 82 Fed. 627, 27 C. C. A. 231, the Circuit Court of Appeals in the Sixth Circuit, in construing Customs Administrative Act June 10, 1890, c. 407, § 9, 26 Stat. 135 [U. S. Comp. St. 1901, p. 1895], as follows: "That if any owner, importer, consignee, agent or 'other person' shall make, or attempt to make, a fraudulent entry of goods, such goods shall be forfeited"—held that, when a forfeiture of merchandise is sought, the words "other person" mean some one of the same general class as those described by the preceding words, and hence did not include a stranger who is a mere trespasser in respect to the goods. The same judge, in the same circuit, in the case of Newport, etc., Co. v. United States, 61 Fed. 488, 9 C. C. A. 579, held that under the Revised Statutes, forbidding interstate carriers of animals to confine them 28 consecutive hours without unloading for rest, water, and feeding, unless prevented "by storm or other accidental causes," and imposing a penalty for "knowingly and willingly" failing to comply with this provision, such unloading is excused by unavoidable causes only, and the words "other accidental causes" refer

to those that are unavoidable, such as storms, and do not include accident to the train resulting from negligence.

In the case of Crystal Spring Distillery Co. **v.** Cox, 49 Fed. 555, 1 C. C. A. 365, the Revised Statutes abating the tax on distilled spirits destroyed while in a bonded warehouse "by accidental fire or other casualty," the words "other casualties" mean an accidental destruction by some cause of like character and operation as fire, and did not include a loss by warping of barrels from unusual and excessive summer heat.

In Erwin v. Jersey City, 60 N. J. Law, 145, 37 Atl. 732, 64 Am. St. Rep. 584, Chief Justice Magie held, as to the words "other matters," used in an act for the government of cities of that state approved April 6, 1889, wherein the mayor of the city is given authority to veto the acts of any board of the city, and it is required that copies of all resolutions "and other matters" shall be furnished to the mayor for consideration, that the words "other matters" did not include any matters other than a class of acts usually performed by such bodies by resolutions or ordinances, and that the general words were restricted to such resolutions and ordinances.

In the case of Livermore v. Freeholders of Camden County, 29 N. J. Law, 247, the act provided that, if any damage shall happen to any person or persons in his, her, or their team, carriage, or "other property" by means of the insufficiency or want of repair of any bridge upon any public road in any township in the state, the person so injured shall have the right to recover damages. The Chief Justice held in this case that the words "other property" did not authorize the recovery of damages to the owner of a gristmill, but the general words were restricted to property of the same kind, as indicated by the specific words.

The words "or other officers" in the fourteenth section of the attachment act, and the same words whenever they occur in the supplements thereto, passed February, 1830, in the state of New Jersey, must be restricted to sheriffs and officers of like kind, and did not include constables. It is enacted by the fourteenth section of this attachment act that if the sheriff or other officer shall, by virtue of any writ of attachment, issued in pursuance of that act, attach, through ignorance, etc., any goods, etc., which shall be claimed by any person as his property, it shall and may be lawful for such sheriff or officer to summon and swear a jury to try the right of property. A constable was not included in the words "other officers." Stryker v. Skillman, 14 N. J. Law, 191. See, also, State v. Gedicke, 43 N. J. Law, 89.

In King v. Thompson, 87 Pa. 369, 30 Am. Rep. 364, the language of the act of 1855 is:

"Whenever any husband for drunkenness, or other cause, shall neglect or refuse to provide for his wife, or shall desert her, she shall have all the rights and privileges secured to a feme sole trader."

It was held that the temporary inability of a man to provide for his wife, by reason of sickness, was not such "other cause" as to entitle the wife to become a feme sole trader. The general words referred to causes of the same kind to those specified.

In Renick v. Boyd, 99 Pa. 555, 44 Am. Rep. 124, the words "other property," employed in the said act, were intended to include only arti-

cles of the same generic character as those already enumerated, such as slate, marble, iron ore, zinc ore, etc., but did not apply to the case of growing crops.

In Pardee's Appeal, 100 Pa. 412, Justice Sterrett said:

"We are clearly of opinion that the business of cutting logs and driving them to the place of manufacture is not such as is contemplated by the act of 1872. Its declared purpose is to secure money due 'for labor and services rendered by any miner, mechanic, laborer, or clerk, from any person,' etc., 'employing clerks * * * or laborers, either as owners,' etc., 'of any works, mines, manufactory, or "other business." ' * * * It is contended that the expression 'other business,' etc., is sufficiently comprehensive to embrace cutting and driving logs. Perhaps it would be, if we were at liberty to construe it without reference to the context; but the preceding words, designating particular branches of business with which the idea of permanency and completeness, in a certain sense, is always associated, must control the meaning of the more general expression used in immediate connection therewith. The 'other business' is ejusdem generis with that more particularly described by the preceding words of the context—business of the same general character, not embracing every species of employment in which the service of others may be rendered."

In Bucher v. Commonwealth, 103 Pa. 528, it was held the words "other persons," following in a statute the words "warehouseman and wharfinger," must be understood to refer to other persons ejusdem generis, viz., those who are engaged in a like business, or who connect the business of warehouseman, etc., with some other pursuit.

These are a few of the cases illustrating the application of the ejusdem generis rule of interpretation of statutes; and it is applied, for the same reasons, with like effect in the construction of contracts (Leake on Contracts [4th Ed.] 148), especially in policies of insurance to clauses intended to work a forfeiture against the insured. The use of words and phrases, the scope and extent of which are uncertain and indefinite, is not to be encouraged in contracts, and especially should they be avoided in contracts of insurance in which the law holds both parties equally bound to the provisions of the writing, when, as a matter of fact, as a rule, the insured is either entirely ignorant of all the terms of the policy, or is possessed only of a vague information of their extent and meaning. The insured, notwithstanding, is, as a matter of public policy, presumed to know and required to observe every covenant and requirement contained in the policy. The policy is skillfully drawn by the insurer, who is not only presumed to know, but who, as a rule, actually does know, the existing conditions and uses of the property insured. It is, therefore, no hardship to insist that provisions therein contained, calculated to work a forfeiture, shall be specific and certain. Especially should this be required in prohibiting the use of keeping hazardous articles upon the premises, and to allow the use and keeping of such only to work a forfeiture as are expressly prohibited. The fact that a great variety of explosives are constantly used by the people in all walks of life, for various purposes, is the strongest argument against the injustice of construing the catch-all phrase "other explosives" in this policy in the broad and comprehensive sense. The old-fashioned gun cap and the head of some matches in everyday domestic use are "explosives"; and though of such an infinitesimal hazard as to warrant the assumption that they were not to be regarded

as included in "other explosives," yet if they are not to be included in "other explosives," of what degree of hazard and difference of explosive force shall indicate where the line shall be drawn, if we stop short of insisting that "other explosives" shall mean explosives of a like kind, nature, and hazard of those particularly specified? And why not insist upon this rule of interpretation? The insurer writes the policy, and it is a very simple matter to prohibit the use of an article on the premises by name, and by use of general words all of its class and kind.

The evidence shows that it has been the custom and usage among the miners in the coal-mining district of Pennsylvania to keep blasting powder upon the premises. The act of 1893 of this state prevents these workmen from taking quantities of this powder in the mines, and, in order that they may continue in the work of coal mining, it is necessary for them to have a safe and dry place to keep their powder. These industrial conditions necessitated the practice of keeping small quantities of blasting powder upon miners' premises, which has long since grown into a custom. Neither the practice nor the existence of the custom is disputed by the insurance company. The company's agent who took this insurance has lived in the mining district for upward of 23 years. He has represented this insurance company for more than six years, and for this company he has been insuring miners' tenements in this vicinity. The plaintiff in error not only did not attempt to produce evidence to contradict the proof of this universal habit of keeping blasting powder upon the premises, but did not even cross-examine the numerous witnesses called to establish the fact, and the defendant in error showed by the company's agent that he, in this case, actually charged and collected from Mrs. Penman a rate nearly double the usual rate for tenement house insurance, and that the extra amount collected was to compensate the insurance company for the additional risk it was to assume in insuring the property against the risk of keeping blasting powder on the premises.

With this knowledge of a hazard, for which the company was paid to assume and which had grown into a custom long known to its agent, against which it could have so easily protected itself in its policy by inserting the words "blasting powder," if it intended to exclude it, it has no just ground whatever for now insisting upon forfeiting the policy upon an indefinite and general use of terms. There can be no other view, however, than that blasting powder was never intended to be covered by the expression "other explosives." The property here insured was located in the state of Pennsylvania. The policy was made and delivered here, where the contract is to be performed. It is, therefore, a Pennsylvania contract, and to be interpreted by the laws of this state (9 Cyc. 582. See note 63 L. R. A. 856), which laws, however, so far as applicable to the facts of this case, do not differ from the law as found in the text-books and decisions of courts of last resort in other jurisdictions.

Insurance against fire was the primary purpose of the contract, and in the construction of general terms the question may be whether the words used should be taken in a comprehensive or restricted sense, in a general or a particular sense, in the popular and common, or in some unusual and peculiar, sense. Parsons on Contracts (6th Ed.) § 501.

"Rules of construction were framed with a view to general results, but they are sometimes productive of injustice by leading to results contrary to the intention of the parties; and the recent tendency is to pay less attention to any such rule and more to all admissible indications of what the intention actually was in the case in hand, including the practical construction of the contract by the conduct of the parties themselves." Wald's Pollock on Contracts (3d Ed.) 318.

"The construction of a contract in writing, as of all written instruments, belongs to the court alone, whose duty it is to construe all such instruments as soon as the true meaning of the words in which they are couched and the surrounding circumstances, if any, have been ascertained as facts; and it is the duty of the jury to take the construction from the court, either absolutely, if there be no words to be construed, as words of art or phrases used in commerce, and no surrounding circumstances to be ascertained, or conditionally, when these words or circumstances are necessarily referred to them." Leake on Contracts (4th Ed.) 142.

"Customary incidents, universally attaching to the subject-matter of the contract in the place where the contract was made, are impliedly annexed to the written terms of the contract, unless the custom is expressly excluded. Parol evidence of custom, consequently, is always admissible to explain the real meaning of the parties, but not to prevail over and nullify the express provisions of the contract. The evidence of usage must, however, be distinct, in order to affect the meaning of the terms of the contract, and not to be inconsistent therewith. The principle on which the evidence is admitted is that the parties have set down in writing those only of the terms of the contract which were necessary to be determined in the particular case, leaving to implication all those general incidents which a uniform usage would annex, and according to which they must be considered to contract, unless they expressly exclude them. Whether the terms of the contract are such as to exclude evidence of the custom is a question for the judge and not for the jury." Addison's Law of Contracts (10th Ed.) 64, 65.

"It has repeatedly been held that a breach of a printed condition of a policy against the keeping of certain substances does not preclude recovery, when the subject-matter insured was known to the insurer to be such that the use of these substances was a necessary and usual incident of the business, provided that the substances be kept only in such quantities and used only in such manner as was necessary and usual." 19 Cyc. 737.

This rule applies to dwelling houses. McKeesport Machine Co. v. Ben Franklin Ins. Co., 173 Pa. 57, 34 Atl. 16, and cases there cited; Lutz v. Insurance Co., 205 Pa. 159, 54 Atl. 721.

Coming, now, to the Pennsylvania cases, it is found that they amply sustain the contention of the defendant in error that in this case it was proper to introduce evidence to determine the subject-matter of the insurance as affected by the surrounding facts and circumstances of the making of the contract, and to show the custom prevailing in connection with the uses for which the insured property was occupied, the knowledge of the insurer of this custom at and before the time the policy was executed, and the fact that the insurance company was paid for the risk involved in the custom or usage of tenants keeping blasting powder upon the premises. Graybill v. Fire Ins. Co., 170 Pa. 75, 32 Atl. 632, 29 L. R. A. 55, 50 Am. St. Rep. 747; Lutz v. Insurance Co., supra. Justice Williams, in 1896, in a well-considered case (McKeesport Machine Co. v. Ben Franklin Ins. Co., supra), said:

"An insurance company issuing a policy upon a business plant, or any portion of it, is chargeable with knowledge of the customary methods of conducting the business in which the property insured is used. Pipe Line v. Ins. Co., 145 Pa. 346, 22 Atl. 665, 27 Am. St. Rep. 703. The rule is not limited to insurance upon property in use for manufacturing or other business purposes.

It was applied in the construction of a policy issued upon a dwelling house in Doud v. Citizens' Insurance Company, 141 Pa. 47, 21 Atl. 505, 23 Am. St. Rep. 263, and in Roe v. Dwelling House Insurance Co., 149 Pa. 94, 23 Atl. 718, 34 Am. St. Rep. 595. It was applied to a policy of insurance upon a horse in Haws v. Fire Association of Phila., 114 Pa. 431, 7 Atl. 159. Still another rule of construction is that the circumstances surrounding the making of the contract and affecting the subject to which it relates form a sort of context that may properly be resorted to for aid in determining the meaning of the words and provisions of the contract. Bole, Assignee, v. New Hampshire Fire Ins. Co., 159 Pa. 53, 28 Atl. 205; Graybill v. Penn Township Mutual Fire Ins. Co., 170 Pa. 75, 32 Atl. 632, 29 L. R. A. 55, 50 Am. St. Rep. 747."

In this case—that is, Machine Co. v. Ben Franklin Ins. Co., supra—the insurance was upon two buildings, one a "pattern shop," and the other a "foundry and machine shop." The policy covered the entire plant, to wit, both buildings and their contents. The fire affected only the foundry and the machine shop, and what was within at the time the fire took place; but this included certain patterns then in actual use in the ordinary course of plaintiff's business, but which were described in the policy as in the pattern shop, where they were kept when not in use. As the pattern shop was not involved in the fire, the insurance company denied its liability for loss of the patterns, because they were described in the policy as in that building, and because by the terms of the policy the undertaking of the insurer was stated as an undertaking to insure the property, real and personal, described in it "while located and contained as described herein, and not elsewhere." Upon the well-recognized principle that the insurer is held to know the custom and usages of the business plant upon which he places the insurance, it was held that the company was liable for the insurance notwithstanding the fact that they were burned "while located elsewhere," but located where the usages and customs of the plant or business to which they belonged placed them. The judge further said:

"If this insurance was upon a going mill or factory, in which the tools, machinery, and patterns were in regular and continuous use for the purposes of the business of the owners, the contract of insurance must be construed in the light of that fact, liberally, in aid of the insured. It was not an insurance upon goods in store, in terms, and, unless it becomes so in the light of the facts appearing in the evidence, there is no legal reason that we can see why the plaintiff should be held to be concluded by words that could not have been intended to apply to a business in actual progress, and that ought not to be so construed, even if the insurer intended thereby to escape from the obligation assumed by the policy. It would enable an insurer, after receiving the money of the manufacturer for an insurance upon his business appliances, to say to him, in effect: 'Close your factory, or forfeit the money you have paid us. To secure the benefit of your policy, you must leave everything unmoved.' Nothing short of a stipulation of this sort, incorporated into the policy in words capable of no other construction, could induce us to aid in the perpetration of such injustice."

Equally pointed is the language used in Snyder v. Insurance Co., 59 N. J. Law, 549, 37 Atl. 1022, 59 Am. St. Rep. 625, illustrating the tendency of all courts to uphold a policy of insurance, and construe words intended to work a forfeiture most strongly against the insurer, and never permit them to extend beyond the strictest construction which may reasonably be put upon them, for the very good reason stated by Justice Depue:

· ."If the terms used are imperfect, it is the fault of the defendants. It is their contract, and the construction of it must be most strongly against them. There was a kerosene oil stove in the shed which was on the premises. The oil stove was used for cooking. The fire broke out in close proximity to the stove. The lamp in the stove was then burning, but the fire was not caused by an explosion. The policy contains a provision that it should be void if 'there be kept, used, or allowed on the above-described premises, naptha or petroleum, or any of its products of equal or greater inflammability than kerosene oil of legal standard [which last may be used for lights only, provided the oil be drawn and the lamps be trimmed and filled solely by daylight].' The contention is that the policy, by force of the above provision, was avoided by the use of kerosene otherwise than in lamps for illuminating purposes. The result of this contention depends upon the construction and effect of the clause of the policy above set out. It is a settled rule in the construction of contracts of insurance that policies of insurance will be liberally construed to uphold the contract, and conditions contained in them which create forfeiture will be construed most strongly against the insurer, and will never be extended beyond the strict words of the policy. Carson v. Jersey City Insurance Co. [43 N. J. Law, 300, 39 Am. Rep. 584]. In Stone's Administrators v. United States Casualty·Co., 34 N. J. Law, 371, Chief Justice Beasley said: 'A qualification of the agreement so restrictive of the rights of the party insured ought not to be admitted, unless the terms of the indorsement will bear no other rational interpretation. If the terms used are imperfect, it is the fault of the defendants. It is their contract, and the construction of it must be most strongly against them.' The principal member of this clause, 'if there be kept, used, or allowed on the above-described premises * * * petroleum, or any of its products of equal or greater inflammability than kerosene oil of legal standard,' is not broken by the use made of kerosene in this instance. The defense rests upon the other member of the sentence, which is inclosed in brackets, viz., 'which last [i. e., kerosene oil of legal standard] may be used for lights only, provided the oil be drawn and the lamps be trimmed and filled solely by daylight.' This member of the sentence imports a regulation of the use of kerosene oil when used for lighting purposes, and the words used are capable of a construction which would give to it no other effect. If the insurer intended to prohibit the use of kerosene for any other purpose than for light, it would have been easy to so express the prohibition in its policies. Policies of insurance against fire are taken out by all classes of persons, educated and uneducated, and no rule of law is more salutary than that conditions in these instruments, expressed in terms ambiguous and capable of misleading, shall not be allowed to avoid the contract. The member of the sentence within the brackets, to say the least, is confusing and ambiguous, when taken in connection with the words which precede it, and should not be allowed to make void this policy under the circumstances of this case." .

In Machine Company v. Ben Franklin Ins. Co., supra, evidence was admitted to show the circumstances surrounding the making of the contract of insurance and affecting the subject to which it related, and upon proof of the usages of the business the insurance company was held to insure subject to them. Even more unjust is the position assumed by this company, who knew of the custom, through its agent, at the time and long prior to the taking of this insurance, and with this knowledge actually collected a premium for the risk of tenants following the usual custom of keeping blasting powder upon the premises, and now, when called upon to pay for the loss resulting from fire caused by the risk for which it was compensated, it endeavors to escape its liability upon a broad and liberal construction of a catch-all phrase, which it urges upon the court should be extended to include the very explosive it knew it was customary to use upon the premises when it insured the property and against the hazard of which it collected a pre-

mium.   Nothing short of an express prohibition of the keeping or using of blasting powder by name upon the premises should induce the court to permit this company to escape a just liability.   The knowledge of the insurance agent in charge of this district of the conditions existing at the date of the insurance is the knowledge of the company itself.   People's Ins. Co. v. Spencer & McKay, 53 Pa. 353, 91 Am. Dec. 217; Humphreys v. National Association, 139 Pa. 214, 20 Atl. 1047, 11 L. R. A. 564; note, 1 L. R. A. 218.

Following are other cases which sustain the claim of the plaintiff below that the insurance company is chargeable with knowledge of customary usages of the tenants in dwelling houses, and that evidence is admissible to show such customs and usages at the time of the execution of the contract of insurance:   Philadelphia Tool Co. v. British American Ins. Co., 132 Pa. 236, 19 Atl. 77, 19 Am. St. Rep. 596; Caldwell Adm. v. Fire Ass'n of Phila., 177 Pa. 492, 35 Atl. 612; Humphreys v. National Benefit Ass'n, 139 Pa. 264, 20 Atl. 1047, 11 L. R. A. 564; Lutz v. Insurance Co., 205 Pa. 163, 54 Atl. 721; Springfield F. & M. Ins. Co. v. Wade, 68 S. W. 977, 95 Tex. 598, 58 L. R. A. 714, 93 Am. St. Rep. 870; Smith v. German Ins. Co., 65 N. W. 236, 107 Mich. 270, 30 L. R. A. 368; Faust v. American F. Ins. Co., 61 N. W. 883, 91 Wis. 158, 30 L. R. A. 783, 51 Am. St. Rep. 876; Maril v. Conn. F. Ins. Co., 23 S. E. 463, 95 Ga. 604, 30 L. R. A. 835, 51 Am. St. Rep. 102; Yoch v. Home M. Ins. Co., 44 Pac. 189, 111 Cal. 503, 34 L. R. A. 857.

## On Petition for Rehearing.

PER CURIAM.   The petition for a rehearing of this case presents no matter that has not already been fully considered by the court.   No reason is perceived why the rehearing should be allowed.

The petition will therefore be denied, and it is so ordered.